# In re O-J-O-, Respondent

*Decided June 14, 1996*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

Suspension of deportation was granted where the 24-year-old Nicaraguan respondent lived in the United States since the age of 13, was educated in this country, speaks English fluently, is fully assimilated into American life and culture, is involved in various activities in this country, runs a small trucking business, has no other means of obtaining lawful permanent resident status, and if deported, would return to a country where economic and political conditions were difficult.

FOR RESPONDENT: Gloria M. Curiel, Esquire, Los Angeles, California

BEFORE: Board En Banc: SCHMIDT, Chairman; HURWITZ, VILLAGELIU, MATHON, AND GUENDELSBERGER, Board Members. Concurring Opinions: DUNNE, Vice Chairman; HOLMES, Board Member; ROSENBERG, Board Member. Dissenting Opinion: FILPPU, Board Member, joined by VACCA, HEILMAN, AND COLE, Board Members.

GUENDELSBERGER, Board Member:

The respondent, a native of Nicaragua, conceded deportability. In a decision rendered on April 19, 1995, the Immigration Judge denied the respondent's requests for asylum, withholding of deportation, and suspension of deportation, but granted voluntary departure. The respondent has appealed the denials of discretionary relief. We sustain the appeal as to the denial of the application for suspension of deportation.

## I. FACTUAL BACKGROUND

The respondent is a 24-year-old native of Nicaragua who lived with his family in Esteli, Nicaragua, until his early teens. The respondent's father was a captain there in the fire department. After a prolonged conflict with local Sandinista officials, including imprisonment and forced resignation from his position, the respondent's father left Nicaragua for the United States, arriving in May 1985. The respondent joined his father in the United States in November 1985. His mother and younger brother arrived soon thereafter.

The respondent attended school in the United States, where he successfully completed elementary school, junior high, and high school. He earned good grades, participated in school sporting events, and became fluent in

speaking, reading, and writing English. He has held a number of jobs and has been active in his church and in community events. In particular, he is an avid fan of softball and baseball and participates as a player in local softball and baseball leagues. He is a deacon in his church, where he not only attends regularly but also participates in the youth ministry program. He has plans to continue his studies at the college level and hopes eventually to become a police officer.

The respondent's father applied for asylum in the United States in 1987, and included the respondent in the application, but the claim was never adjudicated. In 1994, the respondent's father and mother returned to Nicaragua for an interview for an employment-based immigrant visa at the United States consulate. The respondent's father, seriously ill at the time, died before visa processing could be completed. His mother remained in Nicaragua after her husband's death and now resides there. The respondent's brother has left the United States and is living in Guatemala.

The respondent's father had built up a business in the United States as an independent hauler. After his father's death in 1994, the respondent assumed responsibility for the family trucking business.

## II. ISSUES ON APPEAL

In his Notice of Appeal (Form EOIR-26), the respondent claims that the Immigration Judge abused his discretion in denying his applications for relief from deportation. The respondent's brief raises factual and legal questions concerning his claims for asylum, withholding of deportation, and suspension of deportation. In view of our decision on the suspension of deportation issue, we find it unnecessary to reach the issues of asylum and withholding of deportation.

The Immigration Judge determined that the respondent met the 7-year continuous physical presence and good moral character requirements for suspension of deportation under section 244(a) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a) (1994). He found, however, that the respondent failed to demonstrate extreme hardship. The respondent contends that deportation to Nicaragua would cause him extreme hardship as that term is defined in *Matter of Anderson*, 16 I&N Dec. 596 (BIA 1978). We agree with the respondent that, when all of the hardship factors delineated in *Matter of Anderson* are taken into account, their cumulative effect amounts to extreme hardship under the facts presented in this case.

## III. CRITERIA FOR EXTREME HARDSHIP

Under section 244(a) of the Act the respondent must demonstrate that his deportation "would result in extreme hardship to [himself] or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." Since the respondent in this case has no

qualifying relative who is a citizen or a permanent resident of the United States, he must demonstrate extreme hardship to himself.

*Matter of Anderson, supra*, has been the starting point for many years in applying the extreme hardship requirement. *Anderson* involved a 55-year-old native of the Dominican Republic who had overstayed his nonimmigrant visa and resided in the United States for 8 years by the time of his deportation hearing. He claimed that the impoverished economy in his country of origin should be dispositive as to extreme hardship. The Board rejected such a broad approach to extreme hardship, holding that "it is only when other factors such as advanced age, severe illness, family ties, etc. combine with economic detriment to make deportation extremely hard on the alien or the citizen or permanent resident members of his family that Congress has authorized suspension of the deportation order." *Id.* at 598.

In assessing hardship in *Anderson*, the Board found guidance concerning "other adverse factors" in a House Judiciary Committee report on the issue of "extreme hardship" in the context of a bill providing discretionary adjustment of status for certain aliens. *Matter of Anderson, supra*, at 597. This report included the following factors:

1. family ties in the United States and abroad;

2. length of residence in the United States;

3. condition of health;

4. conditions in the country to which the alien is returnable—economic and political;

5. financial status—business and occupation;

6. the possibility of other means of adjustment of status;

7. special assistance to the United States or community;

8. immigration history;

9. position in the community.

This list was not meant to preclude consideration of aspects of hardship which do not fit squarely within one of these nine factors.

Although these factors provide a framework for analysis, the "elements required to establish extreme hardship are dependent upon the facts and circumstances peculiar to each case." *Matter of Ige*, 20 I&N Dec. 880, 882 (BIA 1994). "Relevant factors, though not extreme in themselves, must be considered in the aggregate in determining whether extreme hardship exists." *Id.* In each case, the trier of fact must consider the entire range of factors concerning hardship in their totality and determine whether the combination of hardships takes the case beyond those hardships ordinarily associated with deportation, e.g., economic detriment due to loss of a job or efforts ordinarily required in relocating or adjusting to life in the native country. Such ordinary hardships, while not alone sufficient to constitute extreme hardship, are considered in the assessment of aggregate hardship.

## IV.  APPLICATION OF ANDERSON CRITERIA

The respondent entered the United States in November 1985 when he was 13 years old. He has lived here for over 10 years, including the critical formative years of adolescence.

During his stay in the United States, the respondent has assimilated into American life and culture. He successfully completed elementary school, junior high, and high school in the United States. He won an award for his excellent scholarship in junior high school. He has become fluent in written and spoken English. During his hearing before the Immigration Judge he testified in English rather than Spanish.

Since he graduated from high school, he has held a number of jobs. From 1992 to 1994 he worked as a security guard. In 1994 he took over his father's trucking business and now works as an independent hauler. He hopes to continue his studies and then pursue a career as a police officer.

He is deeply involved in church activities, attending services regularly and serving as a voluntary deacon in his congregation. As a deacon he assists in various church activities, including cleaning the church, taking up collection, and working with young children. The president of the respondent's congregation provided a letter indicating that the respondent has taken preliminary theological classes and that his involvement in youth ministry includes counseling, campaign coordination, and evangelization. The respondent is currently participating in continuing education courses towards full theological requirements for ordination to the ministry.

The respondent is a baseball enthusiast who attends many games each year. He also participates as a player on city league baseball and softball teams. The manager of his baseball team provided a letter praising the respondent as an athlete who has been of great value to the team and the community.

The respondent has close friends in the Los Angeles area, including his cousin, his brother's fiancee, and his own fiancee. The respondent testified that he is very close to his cousin whom he sees on nearly a daily basis. He has also established a close relationship with his brother's fiancee who testified that she has known the respondent for 6 years and that he treats her like a sister. Respondent testified to a close relationship of nearly 3 years with his fiancee who is in the United States awaiting adjudication of her asylum claim.

The Immigration Judge noted that the respondent could participate in church activities and become involved in community activities, such as baseball, in Nicaragua. The hardship related to community involvement, however, derives from the loss of the personal and social bonds established during the course of such activities. We consider not only the length of residence, but also the degree of integration into American society and the strength of attachments to friends and community.

Ordinarily, "the readjustment of an alien to life in his native country after having spent a number of years in the United States is not the type of hardship that is characterized as extreme, since similar hardship is suffered by most aliens who have spent time abroad." *Matter of Ige, supra,* at 883. When an alien has strongly embraced and deeply immersed himself in the social and cultural life of the United States, however, the emotional and psychological impact of readjustment must be considered in assessing hardship. *Santana-Figueroa v. INS*, 644 F.2d 1354, 1357 (9th Cir. 1981) (finding that extreme hardship could result from "the combined effect of depriving the petitioner of his livelihood and uprooting him from a community to which he had belonged and contributed for more than a decade.")

The Supreme Court has noted that "deportation may result in the loss 'of all that makes life worth living.'" *Bridges v. Wixon,* 326 U.S. 135, 147 (1945) (quoting *Ng Fung Ho v. White,* 259 U.S. 276, 284 (1922)). In this case, the respondent has developed such strong ties that deportation to Nicaragua would result in significant hardship on a social and psychological level. We find that deportation in this case would cause significant hardship over and above the normal disruption of social and community ties involved in deportation.

Additional hardship factors in this case relate to the depressed economic conditions and volatile political situation throughout Nicaragua. Although somewhat speculative, these factors do provide some additional weight in the assessment of aggregate hardship. *See Tukhowinich v. INS*, 64 F.3d 460, 463 (9th Cir. 1995) (holding that political unrest in the country of origin should be considered in assessing hardship).

While economic detriment alone is not enough to constitute extreme hardship, it "is still a factor to consider in determining eligibility for suspension of deportation." *Mejia-Carrillo v. United States INS*, 656 F.2d 520, 522 (9th Cir. 1981). In this case, the respondent helped his father to develop and operate an independent trucking business which he continued to manage after his father's death. The respondent's recent tax returns indicate that he has had an income of about $13,000 per year from this trucking business. He testified that were he to return to Nicaragua he could not establish the same kind of business in his home country because of difficult economic and political conditions. His loss of income as well as the business good will he and his father built up over the years are hardships which should be considered.

The Department of State's January 1995 Country Profile for Nicaragua, made part of the record of proceedings below, indicates that "[u]nemployment and underemployment total about 50 percent." Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Nicaragua-Profile of Asylum Claims & Country Conditions* 4 (Jan. 1995) [hereinafter *Profile*]. The economy continues to stagnate with annual per capita income "less than one-third of what it was in the mid-1970s." *Id.* "Nicaragua's political problems continue to hamper economic growth and investors remain wary." *Id.*

In regard to political conditions, the respondent provided testimony and newspaper reports concerning recent Sandinista-related security problems in Nicaragua. The *Profile* reports that "Sandinistas maintain important positions in the military, police, bureaucracy, judiciary and unions. They have followers throughout the population and are in a position to punish and harm their perceived enemies if they have sufficient motive to do so. Furthermore, the Sandinistas can carry out such acts with virtually assured impunity because of their positions within the public safety/security organizations, their influence upon the government and the government's repeated grants of amnesty for past misdeeds." *Profile, supra*, at 5. In light of the respondent's family's history of conflict with the Sandinistas, the current political situation in Nicaragua should be factored into the hardship assessment.

Family unity considerations do not add measurably to the hardship aspects of this case. As indicated above, the respondent is unmarried and has no children. His mother resides in Nicaragua. His brother in Guatemala hopes to return to the United States to marry a permanent resident with a pending naturalization application. The respondent also testified that he has a close relationship with his cousin living nearby and that he has a number of cousins in New York with whom he keeps in touch. The respondent's fiancee is an undocumented alien with a pending asylum claim. The expectation that a brother may obtain permanent resident status and the hope that his undocumented fiancee will be granted asylum, while relevant, add little to the overall assessment of hardship in this case.

That the respondent has relatively weak family ties in the United States does not preclude him from demonstrating extreme hardship under other factors in *Matter of Anderson, supra.* In *Tukhowinich v. INS, supra*, for example, the respondent had never been married and had no children. She had worked in the garment industry in the United States for over 10 years to support her retired parents and five sisters residing in Thailand and three sisters in undocumented status in the United States. The respondent had devoted her life to providing for her family. Although similar work was available in Thailand, she could not have supported her family with the wages she would earn there. The United States Court of Appeals for the Ninth Circuit concluded that "[b]ecause the loss of financially comparable employment would create not only an economic hardship for Ms. Tukhowinich but would severely frustrate what she regards as the overriding mission in her life—to provide for her parents and siblings—we think the BIA should have considered the implications of her economic loss." *Id.* at 464.

Hardship is diminished to the extent that alternate means of obtaining lawful permanent residence may be available. In this case, asylum and withholding of deportation having been denied, the respondent has no present means of obtaining lawful permanent residence.

There is nothing in the respondent's immigration history which would detract from any of the aspects of his hardship claim. He entered the United

States when he was 13 years old and has not left since that time. He has worked with authorization of the Immigration and Naturalization Service and has paid taxes during all of his years of work.

## V. CONCLUSION

This is a close case on the issue of "extreme hardship" but one which, in the final analysis, meets the requirement of significant hardships over and above the normal economic and social disruptions involved in deportation. The respondent has lived in the United States during his critical formative years. He has significant church and community ties in the United States. He is fully assimilated into American culture and society. This assimilation makes the prospect of readjustment to life in Nicaragua much harder than would ordinarily be the case. He would also face difficult economic and political circumstances in his native country, including the possible loss of an ongoing business concern. This combination of hardships amounts to extreme hardship.

With regard to the exercise of discretion, there are no significant adverse factors. The record reflects that the respondent pays his taxes and is law abiding. He holds a position as a deacon in his church, and is well regarded by friends and acquaintances in the community. The record indicates that he has become thoroughly assimilated to life in the United States. Due to his productive and constructive time in the United States, the respondent merits relief in the exercise of discretion.

For the reasons discussed above, we grant the respondent the relief of suspension of deportation and terminate the proceedings.

**ORDER:** The appeal is sustained and deportation of the respondent is suspended under section 244(a)(1) of the Immigration and Nationality Act.

*CONCURRING OPINION:* Mary Maguire Dunne, Vice Chairman

I respectfully concur.

I write separately to make clear what it is that I am deciding in this case. I find it necessary to do so because of the discussion in Board Member Rosenberg's concurring opinion and in the dissenting opinion, much of which I find speculative and irrelevant to the case before the Board. It is my understanding that this case is designated as a precedent to give guidance to Immigration Judges with respect to the extreme hardship required to be established to render an alien eligible for suspension of deportation. While I believe that the majority decision is straightforward and clear, and can be understood and properly applied by a corps of very competent and professional Immigration Judges, I fear that the concurring and dissenting opinions will serve only to confuse the issue as addressed by the majority.

Quite simply, the majority of this Board finds that the respondent has presented sufficient evidence, on this record, to establish that he would suffer extreme hardship if his departure from the United States were enforced. That is *all* that I am deciding. I am *not* deciding that all or most Nicaraguans would qualify for suspension of deportation. I am *not* deciding that 10 years of physical presence is always sufficient to establish eligibility for suspension of deportation. This case is probably close to, if not already at, the outer limit at which I would be ready to find extreme hardship under current Board precedents. It is, as the majority opinion states, a close case. But I have examined the record before me and find that the respondent has carried his burden of establishing all the elements necessary to warrant suspension of deportation.

While I would prefer not to specifically comment on the discussion in either of the separate opinions I have referenced, I feel constrained to comment on the dissent's statement that the majority errs when it relies on "very ordinary community ties" to support its position. "Very ordinary community ties" may be the very factors which make a forced departure from the United States an extreme hardship for some respondents. Like many United States citizens, the great majority of undocumented aliens lead "very ordinary" daily lives in this country. Does that mean that those aliens cannot establish that to break such ties could not constitute an extreme hardship? I think not. But, again, each case must be decided on its own facts and evidence. That is what I have done, and what I believe the majority has done—nothing more and nothing less.

Furthermore, I do not see this decision as any departure from past Board precedents. If one were to review the comparatively few published decisions of this Board over the past 34 years on the extreme hardship requirement of section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(i) (1994), I think that the careful reader would clearly find that the hardship which the respondent would incur is akin to, or in some instances even greater than, the hardship found qualifying in those precedents. Unlike the dissent, I do not read the majority as assigning any weight to the family ties factor. There simply are no family ties which add to the respondent's hardship. While the majority cites the decision of the United States Court of Appeals for the Ninth Circuit in *Tukhowinich v. INS*, 64 F.3d 460 (9th Cir. 1995), I do not read that reference as saying any more than that the absence of family ties does not preclude a finding of extreme hardship. Clearly the facts in *Tukhowinich* were different from the facts in this case, but the principle for which I read the majority to be citing the decision is a correct one.

It is my belief that each suspension of deportation case must be resolved on its own facts and evidence. In this case, I find that this respondent has established, consistent with Board precedents, that he would suffer extreme hardship if forced to depart from the United States. This is not a complex case involving difficult legal issues. We have not been asked to modify or expand the definition of extreme hardship as previously articulated by this Board.

We have not, in my opinion, done so. This is a simple case with a single issue which the majority resolves in a straightforward manner. Any attempt to put any other gloss on this decision is, in my opinion, ill advised and detracts from the instructive value of the decision.

*CONCURRING OPINION:* David B. Holmes, Board Member

I respectfully concur.

The principal issue in this case concerns the meaning of the term "extreme hardship" in section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1994), and how that term should be applied in adjudicating an application for suspension of deportation under that section of law. Although the facts presented in this case likely represent the furthest reaches under which I would find adequate evidence that this "extreme hardship" requirement has been met, I conclude that the majority's finding in this regard is consistent with existing Board precedent for the reasons discussed below.

## I. APPARENT POINTS OF AGREEMENT

The majority opinion and dissent in this case agree that the starting point of analysis of the issue before us is *Matter of Anderson*, 16 I&N Dec. 596 (BIA 1978), which sets forth the factors to be considered in evaluating the term "extreme hardship." There is also apparent agreement with the Board's finding over 30 years ago that the term "extreme hardship" within the meaning of the statute "is not a definable term of fixed and inflexible content or meaning." *Matter of Hwang*, 10 I&N Dec. 448, 451 (BIA 1964).

There similarly is agreement that, when Congress amended the suspension of deportation provisions in 1962, breaking section 244(a) into two subsections, retaining the prior "exceptional and extremely unusual" standard for a more serious class of immigration offenders, who also had to show 10 years of continuous physical presence, and creating the new section 244(a)(1) with a revised "extreme hardship" standard for applicants who only need show 7 years of continuous physical presence, the intent of Congress was to "lessen the degree of hardship" required of applicants for suspension under section 244(a)(1). *Matter of Hwang, supra*, at 452. That being the case, I assume there is agreement that the term "extreme hardship" cannot be defined or applied in a manner that, in effect, simply equates it to the more rigorous "exceptional and extremely unusual" standard. While I am confident that there are many other points of accord, it is at this early point of analysis that disagreement in the present case appears.

The dissent notes, not unfairly, that *Matter of Anderson, supra*, "does little in the way of providing *content* to the ambiguous phrase 'extreme hardship.'" In my view, the best manner in which to provide "content" to this "ambiguous phrase" is to provide examples and discussion in published Board

decisions of factual circumstances in which the Board has concluded that the "extreme hardship" requirement for suspension of deportation eligibility either has or has not been met. Although in recent years the Board has provided little published guidance in this regard, the fact remains there are over 20 published Board decisions that address the "extreme hardship" requirement in cases in which respondents have applied for suspension of deportation under section 244(a)(1) of the Act. These published decisions of the Board have not been overruled, amended, or otherwise modified by the Board. Under the regulations which govern Board and Immigration Judge practice, these decisions "shall serve as precedents in all proceedings involving the same issue or issues." *See* 8 C.F.R. § 3.1(g) (1995). While there is discussion of some of this Board precedent in the majority and separate opinions, much of it goes unreferenced.

This case is the first published Board decision in many years that involves the adjudication of an application for suspension of deportation under section 244(a)(1) of the Act. Therefore, in the interest of the discussion being as complete as possible, I think it useful to identify and briefly summarize existing Board precedent involving "merits" adjudications of suspension applications that include "extreme hardship" determinations. These decisions are categorized below chronologically by outcome (i.e., grouped into those cases in which the Board found the "extreme hardship" requirement not to have been met and those cases in which the Board concluded that the "extreme hardship" element had been established). Although brief summaries of the pertinent "extreme hardship" considerations in each of these cases are noted, I do not claim to set forth every relevant consideration in these cases or to reference every nuance of these decisions. The decisions themselves are there to be read. This—hopefully complete—survey of published Board decisions only includes cases involving "merits" adjudications of applications for relief under section 244(a)(1), rather than motions to reopen to apply for such relief, which often present different issues.[1]

---

[1] The published Board decisions involving motions to reopen proceedings to apply for suspension of deportation which in part address the term "extreme hardship" include *Matter of Ige,* 20 I&N Dec. 880 (BIA 1994) (which includes a comprehensive discussion of the requirements for suspension of deportation); *Matter of Correa*, 19 I&N Dec. 130 (BIA 1984) (holding that equities acquired after a final order of deportation are entitled to less weight); *Matter of Reyes*, 18 I&N Dec. 249 (BIA 1982); *Matter of Sipus*, 14 I&N Dec. 229 (BIA 1972); *Matter of Lam*, 14 I&N Dec. 98 (BIA 1972); and *Matter of Lee*, 11 I&N Dec. 649 (BIA 1966). I find no significant inconsistencies in these decisions and those discussed above. *See also Matter of Pena-Diaz*, 20 I&N Dec. 841 (BIA 1994) (granting a motion to reopen proceedings to apply for suspension of deportation under the more rigorous requirements of section 244(a)(2) of the Act); *Matter of Wong*, 12 I&N Dec. 721 (BIA 1968) (granting suspension of deportation under section 244(a)(2) of the Act).

## II. BOARD PRECEDENT FINDING SECTION 244(a)(1) "EXTREME HARDSHIP" REQUIREMENT NOT TO HAVE BEEN ESTABLISHED

The most recent published Board decision involving a "merits" adjudication of an application for suspension under section 244(a)(1) of the Act was decided by the Board some 17 years ago.

1. *Matter of Saekow*, 17 I&N Dec. 138 (BIA 1979). Unmarried native and citizen of Thailand; 29 years old; entered as a nonimmigrant student; 9 years' residence in the United States; no evidence of family ties to this country; employment as a specialty cook. "Extreme hardship" not established.

2. *Matter of Chumpitazi*, 16 I&N Dec. 629 (BIA 1978). Unmarried native and citizen of Peru; 31 years old; 11 years' residence in the United States; claim of loss of job and inability to financially support mother in Peru; argued difficult readjustment to life in Peru. "Extreme hardship" not established.

3. *Matter of Anderson*, 16 I&N Dec. 596 (BIA 1978). Married native and citizen of the Dominican Republic; 55 years old; wife with "emotional difficulties" unlawfully present in the United States; 10 children and siblings residing in the Dominican Republic; 8 years' residence in the United States; employed as carpenter; principal claim related to economic detriment; cousins are only relatives in the United States. "Extreme hardship" not established.

4. *Matter of Gibson*, 16 I&N Dec. 58 (BIA 1976). Unmarried respondent from Great Britain; 32 years old; 9 years of residence in the United States; entered as nonimmigrant student; 5 semesters of college in this country; primarily employed as a custodian; should have "no difficulty" finding suitable employment abroad; "accustomed to the American way of life"; no relatives in the United States. "Extreme hardship" not established.

5. *Matter of Marques,* 15 I&N Dec. 200 (BIA 1975). Single native and citizen of Spain; 41 years old; entered as nonimmigrant worker; length of residence not stated, but apparently entered as an adult; no family ties; principal hardship claim tied to future access to financial benefits (insurance and industrial commission award) that allegedly would not be available if deported; facts indicate respondent is "a man of substantial means." "Extreme hardship" not established.

6. *Matter of Kim*, 15 I&N Dec. 88 (BIA 1974). Korean husband and wife; both entered as nonimmigrant students after obtaining college educations in Korea; claimed personal hardship arising from unsuitable employment opportunities and hardship to 6½- and 3-year-old United States citizen

children based on diminished educational and economic advantages in Korea. "Extreme hardship" not established.

7. *Matter of Kajoory*, 12 I&N Dec. 215 (BIA 1967). Unmarried native and citizen of Iran; 32 years old; 11 years' residence in the United States; no family ties in this country; entered as nonimmigrant student; hardship claim principally related to fear of persecution if returned to Iran, severely limited economic opportunities in that country, lack of opportunities in his own particular field, and difficulty adjusting to lower standard of living in Iran. "Extreme hardship" not established.

8. *Matter of Sangster*, 11 I&N Dec. 309 (BIA 1965). Native and citizen of Jamaica; 36 years old; entered as nonimmigrant student when over 26 years old; no dependents in this country; married to lawful permanent resident, but marriage never consummated and possibly under annulment proceedings; principal hardship would simply be economic detriment; not a "scintilla of evidence" in the record that suitable employment was unavailable in Jamaica or England. "Extreme hardship" not established.

9. *Matter of Uy*, 11 I&N Dec. 159 (BIA 1965). Unmarried native of the Philippines and citizen of China; 28 years old; entered as nonimmigrant student when about "19½ years old"; student and part-time worker; parents and siblings in Philippines, and all of his brothers employed; claim of hardship principally tied to difficulty in adjusting to new environment outside the United States and claim of limited opportunities in his field of academic training. "Extreme hardship" not established.

10. *Matter of Liao*, 11 I&N Dec. 113 (BIA 1965). Unmarried native of China; advanced training as a pilot, skill as contact lens technician, and college education; 39 years old; admitted as nonimmigrant worker when approximately 28 years old; hardship claim tied to fear of persecution and to claim of diminished employment opportunities; employed as stockman; sought permanent residence to complete undergraduate degree and to do postgraduate work; claim that anticipated training would be of more benefit in this country than in Formosa; Board noted in part that the respondent would "be in a better position to obtain employment . . . than when he entered the United States." "Extreme hardship" not established.

## III. BOARD PRECEDENT FINDING SECTION 244(a)(1) "EXTREME HARDSHIP" REQUIREMENT TO HAVE BEEN ESTABLISHED

Following are the Board's published cases involving "merits" adjudications of applications for suspension of deportation under section 244(a)(1) of the Act in which the Board found the requirement of "extreme hardship"

established and ultimately granted suspension of deportation or affirmed Immigration Judge grants of such relief.

1. *Matter of Loo*, 15 I&N Dec. 601 (BIA 1976). 53-year-old native and citizen of China; 25 years' residence in the United States; lawful permanent resident daughter; small investment in United States business in which he was employed. "Extreme hardship" requirement met.

2. *Matter of Piggott*, 15 I&N Dec. 129 (BIA 1974). Husband and wife respondents; natives of Antigua and citizens of the United Kingdom and Colonies; minor United States children; Immigration Judge finding that respondents would not be able to provide for their own necessities in Antigua and that respondents' children would suffer because of parents' inability to provide them with proper food, living facilities, and education in that country; youngest United States citizen daughter afflicted with rheumatic fever, under physician's care, and "equal medical care . . . not available in Antigua." "Extreme hardship" requirement met.

3. *Matter of Ching*, 12 I&N Dec. 710 (BIA 1968). Native and citizen of China; 55 years old; lawful permanent resident spouse; 16 years' residence in the United States following deportation in 1952; employed as cook; no relatives of either the respondent or his wife residing in the United States. "Extreme hardship" requirement met. Board also concluded that, even if respondent's application were considered under the more stringent provisions of section 244(a)(2) of the Act, suspension of deportation would be granted.

4. *Matter of Wong*, 12 I&N Dec. 271 (BIA 1967), *overruled on other grounds, Matter of Dilla*, 19 I&N Dec. 54 (BIA 1984). Native and citizen of China; 36 years old; 15 years' residence in the United States; married to a native and citizen of China who resided in Canada with their three children, ages 16, 6, and 5; two youngest children born in Canada; partner in grocery store; speaks "acceptable English"; would suffer "considerable financial hardship" if deported. "Extreme hardship" requirement met.

5. *Matter of Gee*, 11 I&N Dec. 639 (BIA 1966). Native and citizen of China; 32 years old; entered the United States when 18 years of age; 14 years' residence, interrupted by 4 months' trip to Formosa in 1960 during which the respondent was married; respondent subsequently divorced from wife and did not know her whereabouts; employed in laundry; supports mother who resides in Hong Kong; father is deceased; 2 years' honorable service in the United States Army; respondent submitted that it would be "very difficult" to obtain a job outside this country and that he had "become accustomed to the way of life here." "Extreme hardship" requirement met.

6. *Matter of Lum*, 11 I&N Dec. 295 (BIA 1965). Native and citizen of China; 29 years old; lived in United States for 14 years after entry at age of 15 years; regularly employed; owned 1/2 interest in restaurant from which he derived monthly income; "doubtful" he would be able to earn a comparable income elsewhere; "probably would suffer a substantial loss on his investment in the restaurant"; last entered the United States in 1962 under false claim to citizenship; married to a native and citizen of China who was attending school in Hong Kong and supported by the respondent; no children; service in United States Army. "Extreme hardship" requirement met.

7. *Matter of Chien*, 10 I&N Dec. 387 (BIA 1963). Native and citizen of China; 32 years old; 9 years' residence; originally entered as nonimmigrant student; became exchange visitor and granted waiver of 2-year foreign residence requirement; respondent's wife apparently a native and citizen of China, who was beneficiary of a waiver of the 2-year foreign residence requirement; wife was a pediatrician, but not employed; two United States citizen children, ages 4 and 2; employed as assistant professor of psychology engaged in problems of "wound shock" under contract with the Office of the Army Surgeon General; although beneficiary of a visa petition, respondent could not "readily" obtain an immigrant visa to adjust his nonimmigrant status because the relevant quota was oversubscribed. "Extreme hardship" requirement met.

8. *Matter of Woo*, 10 I&N Dec. 347 (BIA 1963). Native and citizen of China; 28 years old; entered the United States at age 12 and resided here for 15 years; served in the United States Armed Forces; married a native and citizen of China in Hong Kong in 1959; wife and 2-year-old foreign-born son reside in Hong Kong; excellent employment record and reputation. "Extreme hardship" requirement met.

9. *Matter of Leong*, 10 I&N Dec. 274 (BIA 1963). Married, native of China; 31 years old; originally entered the United States at age 18; last entered 3 years before deportation proceedings; United States military service and service-incurred 30% degree of disability; wife was a native and citizen of China who resided in that country; graduated from high school in the United States; employed in various capacities in restaurants in this country; the respondent's "adult years" had been spent in the United States; his earning ability had been impaired by his service-incurred disability. "Extreme hardship" requirement met.

10. *Matter of McCarthy*, 10 I&N Dec. 227 (BIA 1963). Native and citizen of Canada; 45 years old; twice deported, but first entry at age 6; had presence in United States spanning some 40 years; lawful permanent resident spouse and three United States citizen children, ages 8, 16, and 19; otherwise ineligible for visa. "Extreme hardship" requirement met.

11. *Matter of Louie*, 10 I&N Dec. 223 (BIA 1963). Native and citizen of China; 42 years old; 11 years' residence in the United States; respondent's Chinese wife and child still resided in Hong Kong; respondent contributed to their support; employment as waiter; permanently disabled, elderly United States citizen father, who resided in "International Guest Home" in Los Angeles; respondent contributed to cost of father's maintenance and took his father to the doctor weekly; respondent and his father had no other close relatives in the United States. In view of "the father's advanced age and physical condition, . . . it would be extremely harsh, both to the respondent and his father, to deport [the respondent] from the United States. "Extreme hardship" requirement met, both as to the respondent and to his United States citizen father.

## IV. CONCLUSIONS

I will not restate the facts of this case which are fully set forth in the majority and dissenting opinions. However, considering these facts and the Board precedent outlined above, I reach three principal conclusions.

First, the majority's conclusion that the "extreme hardship" requirement of section 244(a)(1) has been met by this respondent is not inconsistent with any existing Board precedent which has concluded that applicants for such relief have not satisfied this statutory requirement. In my view, the published cases involving denials of relief that are most analogous to the respondent's are *Matter of Chumpitazi, supra; Matter of Gibson, supra; Matter of Marques, supra; Matter of Kajoory, supra; Matter of Sangster, supra; Matter of Uy, supra;* and *Matter of Liao, supra*. However, particularly given the respondent's age at entry and the other evidence noted by the majority, a fair reading of these cases reflects that this respondent presented more compelling evidence of hardship than was evidenced in these precedents.

Secondly, I find that the evidence of hardship presented by this respondent is akin to and, in some ways, more significant than that present in the most analogous published cases involving grants of relief under section 244(a)(1) of the Act. I agree with the dissent that these cases are *Matter of Gee, supra; Matter of Lum, supra;* and *Matter of Woo, supra*. While the respondents in these three cases had longer residence in this country, two of them first arrived in the United States at what to me was a meaningfully older age (e.g., entry at 13 years of age by the respondent herein as opposed to entry at age 18 as was the case in *Matter of Gee*); each of the respondents in these prior cases had their residence interrupted by departures from the United States during which they married abroad; and both Lum and Woo had wives residing in Hong Kong at the time their applications for suspension of deportation were considered.[2] While one can focus on different aspects of each of these cases,

---

[2] The dissent references the fact that each of these respondents had service in the United States military. But, there was no significant discussion of this fact in these three cases in the

the dissent acknowledges that there is at least one element (i.e., age at entry) of the present respondent's case that weighs more heavily in his favor than was present in these previous published grants of relief.

The dissent alternatively states that "close observers" would note that the Board has consistently construed the phrase "extreme hardship" more narrowly over the past two decades than it did in the first decade after the "extreme hardship" standard was enacted by Congress in 1962. What is noticeably lacking after this statement is *any* citation to Board precedent. The dissent references the United States Supreme Court sanctioning of the Board's "narrow interpretation" of "extreme hardship" in *INS v. Jong Ha Wang*, 450 U.S. 139 (1981), and suggests that the Court was approving a narrower construction of this phrase than the Board has articulated in its published decisions. But the Board's decision in *Wang*, which involved a motion to reopen filed by respondents who had entered the United States as nonimmigrant treaty traders and who were the "relatively affluent, educated" Korean parents of two young United States citizen children, was fully consistent with Board precedent. *INS v. Jong Ha Wang, supra,* at 143. Aside from the fact that none of the Wangs' "allegations was sworn or otherwise supported by evidentiary materials," the suggested facts of their case seem very similar to those in *Matter of Kim, supra*, in which the Board (properly in my view) found insufficient evidence of "extreme hardship." *INS v. Jong Ha Wang, supra,* at 142.

Finally, I end this decision as I began it. I find that the facts of this case likely represent the limits under which I would find that the "extreme hardship" element of section 244(a)(1) is satisfied. What might seem marginal factual changes in this case to some (e.g., if the respondent had first entered this country when he was 18 years old) would lead me to a different conclusion. I likewise suspect that some in the dissent would change their view if there was marginally stronger evidence of hardship (e.g., if the respondent had entered the United States when he was 8 years old). Decisions involving "extreme hardship" can be difficult to make and, at the margins, perhaps hard to distinguish. Nonetheless, I conclude that the grant of relief in this case by the majority is fully consistent with controlling Board precedent. Accordingly, I concur.

## CONCURRING OPINION: Lory D. Rosenberg, Board Member

I respectfully concur.

---

context of the "extreme hardship" requirement. Rather, since these respondents had interruptions in their presence in this country, the discussions of military service related to their eligibility for relief under section 244(b) of the Act. That section absolved them from meeting the continuous physical presence requirement of section 244(a)(1) so long as they "served for a minimum period of twenty-four months in an active-duty status in the Armed Forces of the United States" and were separated "under honorable conditions."

I concur in the majority opinion in its entirety. I write separately because I find the legal analysis in the dissenting opinion to warrant a response.

Let me begin by declaring that I do believe that an analytical framework is essential to the case by case determinations in which this Board engages when we adjudicate eligibility for suspension of deportation. A reasonable and fair assessment of the variety of factors presented in any one individual case depends upon a clear construction of the statute and a comprehensive understanding and application of our precedent decisions. While, hopefully, one should be able to glean this Board's interpretation of the statute by extrapolating from the decisions we issue in individual cases, it is a legitimate endeavor to address the standard as we understand it, in this, our first precedent decision on the merits of an application for suspension of deportation since *Matter of Anderson*, 16 I&N Dec. 596 (BIA 1978).

*First, it is within our authority to interpret and apply the statute we administer.* The dissent appears to take issue with the majority's assertion that this is a close case. In all cases involving the application of statutory standards to individual circumstances, some fact patterns will be closer than others. The dissent suggests that the result reached by the majority can only be achieved by a "generous" application of the term "extreme" to the level of the respondent's hardship. The suspension of deportation provisions are remedial in nature, and, arguably, all favorable results could be characterized as being a generous exercise of this Board's discretion. *Wadman v. INS*, 329 F. 2d 812 (9th Cir. 1964).

In fact, as the Supreme Court recognized, this Board has the authority both to interpret the term "extreme," *INS v. Jong Ha Wang,* 450 U.S. 139 (1981), and to make judgments about its appropriate application to differing fact patterns. If a presentation of hardship is found by this Board, in the aggregate, to fall close to whatever line might exist between extreme and not quite extreme, we are well within our authority to make that determination, notwithstanding that the dissent might choose to characterize it as generous. As I discuss below, our so doing in this case does not abrogate our obligation either to be true to the statutory language and a reasonable interpretation of its terms, or to decide cases consistently with our outstanding precedent decisions.

*Second, the interpretation of the term "extreme hardship" reflected in the instant decision is consistent with the statute and this Board's precedents.* Although the dissent properly recognizes that *Matter of Anderson, supra,* only sets forth factors for examination and provides limited guidance in terms of their measurement, its subsequent discussion of how "extreme hardship" should be interpreted is flawed. The dissent initially appeals to the plain language of the term "extreme" found in the statute, and then, proceeding from an isolated examination of the term, argues that a narrow, restrictive interpretation has been upheld by the Supreme Court.

In my view, the dissent's analysis contravenes the Supreme Court's own teachings as to statutory interpretation and deference toward the administering

agency. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under these principles, the Court defers to a reasonable agency interpretation only if the statute is silent or ambiguous. *Castellon-Contreras v. INS*, 45 F.3d 149, 153, (7th Cir. 1995) (citing *Chevron, supra*, at 843-44). As evidenced by this very decision, and the decisions of this Board which have preceded it, the term "extreme" in the statute is not readily defined, at least in its application. *Matter of Ige*, 20 I&N Dec. 880, 882 (BIA 1993) (stating that "extreme hardship" is not a definable term of fixed and inflexible content or meaning and depends on the facts and circumstances peculiar to each case).

It is worth noting that when the first suspension provision was enacted in 1940, the required showing was only "serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien." Act of June 28, 1940, 54 Stat. 670. In 1952, for a variety of reasons, the socio-political pendulum swung in the opposite direction and Congress enacted the far more restrictive standard of "exceptional and extremely unusual hardship." *See* Act of June 27, 1952, ch. 477, § 244(a)(1), 66 Stat. 163, (codified at 8 U.S.C. § 1254(a)(1) (1958)). Ten years later, Congress retreated from this position, and while it retained "exceptional and extremely unusual" as the standard for relief under section 244(a)(2) of the Act, it required only "extreme hardship" for section 244(a)(1) cases. *See* Act of October 24, 1962, Pub. L. No. 87-885, § 4, 76 Stat. 1247, (codified at 8 U.S.C. § 1254(a) (1964)).

In examining the term "extreme," the dissent contrasts it against other descriptive language Congress might have chosen to convey the level of hardship required to warrant consideration for suspension of deportation under section 244(a)(1) of the Act, 8 U.S.C. § 1254(a)(1)(1994). The dissent posits that, according to a "common definition ["extreme"] means 'existing in a very high degree,' 'most advanced,' or 'very pronounced or excessive.'"That may be; however, in my view, it does little to advance the analysis, as the dissent contravenes yet another principle of statutory construction: that a statute must be construed to give meaningful effect to all its provisions. Whole act analysis compels a reasonable agency interpretation to take into account the nature and design of the statute as a whole. *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988); *see also COIT Independent Joint Venture v. Federal Sav. and Loan Ins. Corp.,* 489 U.S. 561 (1989) (stating that "whole statute" interpretation dictates that statutory sections should be read in harmony to achieve a harmonious whole).

Absent from the dissent's analysis is any meaningful comparative consideration of the second subsection in the statutory section under scrutiny, section 244(a)(2), which requires a showing of "exceptional and extremely unusual" hardship. *See INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (holding that the Board may not blur the distinctions between two related but separate statutory standards or reduce them into one); *Matter of Hou*, 20 I&N

Dec. 513 (BIA 1992) (finding that Congress' use of two separate standards requires the Board to give each independent effect). The dissent notes that the second subsection imposes a more stringent standard for determining the presence of qualifying hardship, but dismisses it as of neglible effect to what it sees as an overall restrictive statutory purpose. Inexplicably, the dissent fails to even mention the Board's decision in *Matter of Pena-Diaz*, 20 I&N Dec. 841 (BIA 1994), our only decision in the past 30 years to address "exceptional and extremely unusual" hardship, or to address its relevance to the issue at hand.

While we engage in a case-by-case determination in adjudicating suspension claims, any analysis of factors such as those in *Matter of Anderson*, 16 I&N Dec. 596 (BIA 1978), must be measured against some set of criteria. The question therefore becomes, when does the adjective "extreme" apply to a sum of human hardship, and how can we distinguish this level of inconvenience, discomfort, suffering, misery, or privation from that which is not extreme, or that which is "exceptional and extremely unusual"?

Regrettably, while earlier decisions of the Board both prior to and after the 1962 amendments provide some guidance as to which factors combine to constitute extreme hardship, the precedent decisions of this Board issued over the past 20 years are limited in instructing affirmatively what constitutes the level of hardship that can be considered to be extreme.[1] *See, e.g., Matter of Anderson, supra* (finding adult resident of 8 years having a spouse with a medical condition and facing adverse political and economic conditions in homeland unable to demonstrate an aggregate of factors beyond economic detriment); *Matter of Kim*, 15 I&N Dec. 88 (BIA 1974) (holding unproven claim of lesser economic and educational opportunities for nonimmigrant student couple with preschool age children insufficient to establish extreme hardship). Although the Board undertook to examine and address the concept of extreme hardship 2 years ago in *Matter of Ige, supra*, the decision is silent about ways in which the standard could be satisfied, and instead offers only a compendium of instances where the required showing of extreme hardship could not be made.[2]

---

[1] Prior decisions do exist in which extreme hardship, and even exceptional and extremely unusual hardship, is found to be established. *Compare, e.g., Matter of Lum*, 11 I&N Dec. 295 (BIA 1965) (adult with 13-year residence combined with loss of income from part ownership of restaurant) *and Matter of Louie*, 10 I&N Dec. 223 (BIA 1963) (adult having family abroad, with 11-year residence and an elderly, dependent father) *with Matter of W-*, 5 I&N Dec. 586 (BIA 1953) (higher standard satisfied by married female with residence of 9 years, five dependent children, and few assets to allow expense of travel abroad to obtain visa) *and Matter of S-*, 5 I&N Dec. 409 (BIA 1953) (higher standard satisfied by 27-year residence, limited savings, and prospect of severe financial hardship if forced to travel abroad for a visa).

[2] The dissent contends that the factual accuracy of the trend in recent Board decisions is beyond dispute. However, the precedential value of prior Board decisions may be diminished in the event they rely on broad and arguably unwarranted extrapolations drawn from individual, fact-based findings. For example, *Matter of Kim, supra,* often cited for the principle that the

I believe there is a way to determine what constitutes extreme hardship consistent with the statute, and I submit that two elements are involved in this assessment, which correspond, respectively, to sections 244(a)(1) and 244(a)(2) of the Act. The first is the *level* or degree of hardship, including the *unique character* of the suffering, but *not* the extent to which others who may be similarly situated would or would not experience the same type of hardship to the same extent. The second involves at least an equivalently high-level of hardship plus evidence of its unique, not commonly experienced, character.

Given the mandated statutory distinctions, the Board's decision in *Matter of Pena-Diaz, supra,* our only decision in the past 30 years to address "exceptional and extremely unusual" hardship, is instructive.[3] As I read the decision, the hardship factors presented by the alien (long residence, family ties, steady employment, participation in community affairs, lack of another means to adjust) are not materially of greater degree and certainly not unique compared to those we see in many typical section 244(a)(1) suspension cases today. While it may be argued that the outcome was influenced in part by the unusual circumstances of the Immigration and Naturalization Service's intermittent acquiescence to the respondent's continued presence in this country after an order of deportation, that is precisely the point under the standard applied in that case.

In assessing "extreme" hardship, our point of reference is the individual, and we measure only the first element, the *level* of suffering. What is out of the ordinary, or of significant impact, *for that individual* can be "extreme." While the plain language, "extreme," may require an inquiry into the degree of suffering to be experienced by an individual, it does not require that hardship be either unique or unusual. I believe that this construction is not only consistent with *INS v. Jong Ha Wang, supra*, which addressed only the degree and not the comparative level of projected suffering, but best gives

---

forced departure of United States citizen children does not constitute extreme hardship, was decided more on an evidentiary basis than on the merits of the weight to be given hardship claims involving children. There, the Board found only that allegations of diminished educational and economic opportunity, and I emphasize that they were only unproven allegations, were insufficient to establish extreme hardship. *Id*. at 89-90.

[3] In a related context, the standard of "exceptional hardship," which is capable of meaning both greater than and different from ordinary hardship, is used to determine eligibility for obtaining one of the four statutory waivers of the foreign residence requirement applicable to many exchange visitors. Section 212(e) of the Act, 8 U.S.C. § 1182(e) (1994). While such waivers ostensibly are outside the jurisdiction of the Board, a number of precedent decisions rendered by the Immigration and Naturalization Service find it to encompass, without regard to whether it is unique, circumstances of professional career interruption, poor nutrition and lesser education for children, and family separation. *See, e.g., Matter of Iberra*, 13 I&N Dec. 277 (R.C. 1968); *Matter of Habib*, 11 I&N Dec. 464 (D.D. 1965). It is not unreasonable for us to give those precedent decisions some weight in the course of our independent interpretation of hardship standards in the suspension context.

meaning to our precedent decisions, including especially, *Matter of Anderson, supra,* which specifies that a combination of individual factors could result in extreme hardship.

*Third, judicial acceptance of a "narrow interpretation" or view of "extreme hardship" is not unequivocal.* The dissent's assertion that a narrow interpretation has been upheld by the Supreme Court is misleading. True, it may be argued that *INS v. Jong Ha Wang, supra*, set some benchmark endorsing this Board's interpretation of access to suspension of deportation relief under the extreme hardship standard—one which admittedly has enjoyed consistent acceptance by the federal courts. It is notable, however, that neither *INS v. Jong Ha Wang, supra,* nor *INS v. Rios-Pineda*, 471 U.S. 444 (1985), involved a straightforward claim of suspension of deportation.[4] *Wang* was presented in the context of a motion to reopen which the Board denied, finding no prima facie showing of economic or educational hardship to exist for two affluent, college-educated Korean parents and their children. Similarly, in *Rios-Pineda*, the Board and Supreme Court appeared largely to reject the substantive hardship claims on the grounds that the movants had indulged in manipulating the system procedurally. Closely read, moreover, the Supreme Court in *Wang* acknowledged only that a narrow interpretation was *not precluded* by the statute.

Further, what has not found consistent acceptance in the federal courts is the method this Board employs for determining the degree of hardship or weighing the hardship factors presented. While courts regularly may accept many of our discretionary decisions as a matter of deference to the agency, it is not infrequent to see decisions remanded for a perceived failure to consider one or more aspects of the hardship that will result from deportation. *See e.g., Mejia-Carrillo v. United States INS,* 656 F.2d 520 (9th Cir. 1981) (failure to consider the noneconomic hardships resulting from removal); *Ravancho v. INS,* 658 F.2d 169 (3d Cir. 1981) (failure to consider psychiatric information); *see also Salameda v. INS*, 70 F.3d 447 (7th Cir. 1995) (failure to adequately consider hardship to undocumented child and respondent's wrenching separation from community ties); *Tukhowinich v. INS*, 64 F.3d 460 (9th Cir. 1995) (failure to consider adequately respondent's role as sole provider for undocumented family here and abroad); *Watkins v. INS*, 63 F. 3d 844 (9th Cir. 1995) (failure to consider all factors including spouse's hardship, fear of persecution, child's inability to master a foreign language, and psychological considerations); *Dulane v. INS*; 46 F.3d 988, 994-96 (10th Cir.

---

[4] Scholars, litigators, and courts alike have recognized the confusion worked by attempting to construe judicial decisions concerning extreme hardship when such adjudications are coupled with motions to reopen which independently impose a "prima facie showing" standard, as well as require the exercise of discretion. *See, e.g.,* Aleinikoff, Martin and Motomura, *Immigration Law and Policy*, 653, 666; Note, *Developments in the Law—Immigration Policy and the Rights of Aliens*, 96 Harv. L. Rev. 1286, 1396 (1983); *Ravancho v. INS*, 658 F.2d 169 (3d Cir. 1981).

1995) (failure to consider all factors); *Turri v. INS*, 997 F.2d 1306 (10th Cir. 1993) (failure to consider substantial involvement and work in the community); *Cerillo-Perez v. INS*, 809 F.2d 1419 (9th Cir. 1987) (failure to adequately consider hardship to qualifying family members); *Saldana v. INS*, 762 F.2d 824 (9th Cir. 1985), *amended*, 785 F.2d 650 (9th Cir. 1986) (distortion and disregard of important factors is failure to consider all relevant factors); *Batoon v. INS*, 707 F.2d 399, 402 (9th Cir. 1983) (same); *Santana-Figueroa v. INS*, 644 F.2d 1354, 1357 (9th Cir. 1981) (same).

I believe that some if not all of these remands represent an unstated displeasure with the severity and impropriety with which the Board until now has construed and applied the term "extreme hardship." Yet, this is the approach which the dissent here urges is proper.

*Fourth, the presence or absence of legislative ratification of the "narrow interpretation" is only relevant where the statutory terms are properly construed.* The dissent asserts support for its analysis in the lack of congressional action to alter this Board's purported interpretation of the statutory language or our application of it. The dissent argues further credit is due its position, as Congress has not disturbed these Supreme Court decisions, ostensibly founded upon this Board's assessments which the dissent characterizes as "narrow." However, despite its citation to *INS v. Phinpathya*, 464 U.S. 183 (1984), resulting in specific congressional action to overrule an interpretation of this Board that had been endorsed by the Supreme Court, *see* section 244(b)(2) of the Act (stating that suspension applicants *may* establish continuous physical presence despite brief, casual and innocent departures), that example is not determinative. *See Brown v. Gardner*, 513 U.S. 115 (1994) (rejecting longstanding agency regulation, although not disturbed by intervening legislation, as being contrary to statutory language); *Demarest v. Manspeaker*, 498 U.S. 184 (1991) (finding administrative construction upheld by federal courts of appeal, nonetheless, not entitled to deference when construction was contrary to the plain language); *see also Matter of Sanchez,* 21 I&N Dec. 444 (BIA 1996) (Rosenberg, concurring and dissenting in part).

*Fifth, the proper evaluation of the individual factors presented in this case requires recognition of and adherance to the law of the United States Court of Appeals for the Ninth Circuit.* The dissent proceeds to make arguments based on the facts of this case, accompanied by selective citations, which, in my view, are not representative of either established or developing law in the Ninth Circuit in which this case arises, to support its position. *See Tukhowinich v. INS, supra; Watkins v. INS, supra; see also Castrejon-Garcia v. INS*, 60 F.3d 1359 (9th Cir. 1995); *Khan v. INS,* 36 F.3d 1412 (9th Cir. 1994). While the dissent acknowledges that the respondent, who arrived as a 13-year-old with his family and who apparently has integrated himself into American society, might experience hardship, it proceeds to diminish this hardship in the name of a "narrow" interpretation of the

standard. Notwithstanding such hardship, the dissent argues that the subsequent death of the respondent's father and the departure of his mother from the United States extinguishes his family ties here; and that, due to the apparently undocumented status of the respondent's fiancee and other remaining family members, they are of no account. It is as though these losses, by resulting in the respondent's having fewer ties here, somehow reduces the substance of his claim. To the contrary, I would view such personal losses as arguably enhancing the hardship to be experienced by an individual forced to sever ties with everything he has known and relied upon since adolescence.

In addition, the dissent attempts to address—and dismiss—elements of psychological, financial, and family unity hardship considerations in this case. The dissent suggests that financial hardship is not inextricably linked to, but divorced from, emotional or psychological hardship in this case. It is as though the respondent's loss can be dismissed as one involving only a modest inheritance from his father, and that his means of making a living is devoid of significance. Countless literary and dramatic works, most aptly presented in American literature by Arthur Miller in *Death of a Salesman,* indicate to the contrary how individual human identities may be determined by their endeavors and the work they are able to perform. The dissent dismisses this factor as one having only monetary value.

The dissent further jumps upon the respondent's ability to integrate himself into our American society at age 14 as evidence that he would not experience cognizable hardship today moving to a city outside America. This claim, in my view, deserves no comment. Further, while the dissent obviously has done some digging to find a case arguably in support of its position that no regard should be given to a respondent's hardship in relation to separation from family members who themselves are without lawful status, the one 1987 case cited has long been supplanted by other authority in the Ninth circuit. *See, e.g., Tukhowinich v. INS, supra* (finding hardship when deportation would deprive respondent of ability to fulfill role as family provider for those overseas and those in unlawful status in United States); *Kahn v. INS, supra* (holding that hardship in relation to domestic partner not specified for consideration in the statute may be considered); *see also Salameda v. INS, supra* (interpretation of statute as flatly precluding consideration of hardship to undocumented minor child not rational). Moreover, the Ninth Circuit has been critical of this Board as being overzealous in grasping at any interpretation of law or facts which will allow it to defeat a bona fide claim for suspension of deportation. *Castrejon-Garcia v. INS*, 60 F.3d 1359, 1362 (9th Cir. 1995).

*Sixth, the dissent makes no effort to assess the factors in their aggregate.* The precedent of this Board and the Ninth Circuit mandate that extreme hardship is to be measured cumulatively. A comprehensive evaluation of several single factors, taken together, is *implicit* in *Matter of Anderson, supra*, at 598 (stating that it is only when other factors combine with economic detriment to

make deportation extremely hard on the alien or the citizen members of his family that hardship of deportation can be termed extreme); it is *explicit* in *Matter of Ige, supra*, at 882; and it is *required* under *Watkins v. INS, supra* (finding that BIA erred because, of those factors it did consider, it considered them in isolation); *Batoon v. INS, supra*, at 401; and *Santana-Figueroa v. INS, supra,* at 1357.

As the majority properly finds, the combination of economic, emotional, family, social, and cultural factors present in this case, in the aggregate, establish that the respondent would experience extreme hardship were he to be deported to Nicaragua. After growing from youth to adulthood during his 10 years in the United States, the respondent would lose his present means of making a living, suffer financial deprivation, forego the support system he has established with his fiancee, his brother, and his community, and face life alone in the economically and politically embattled climate in Nicaragua. For this respondent, in these circumstances, this combination of factors establish extreme hardship.

*Finally, I do not take issue with the approach and result advanced by the dissent without setting forth affirmatively my own interpretation of the questions underlying the case before us*. In my view, nothing proposed by the dissent in either its definition or its invocation of Supreme Court endorsement and federal court deference provides any further illumination to what is meant by a "narrow" interpretation of extreme hardship, other than that relief should be unavailable to almost everyone. A further elaboration of my own views of how this Board ought to examine and interpret the standing statutory provisions relating to suspension of deportation is set forth extensively and supported by authorities in an unpublished decision, *Matter in Lopez-Medina,* A71 596 039 (BIA May 29, 1996). The decision is available for public review and scrutiny and I will not reiterate my views fully here. However, suffice it to say that I reject the arguments made by the dissent as not furthering in any manner the analysis of what will be found to constitute extreme hardship, and not providing to the Immigration Judges or to the public the apparently needed guidance from this Board pertaining to this issue.

*DISSENTING OPINION:* Lauri S. Filppu, Board Member; in which Fred W. Vacca; Michael J. Heilman; and Patricia A. Cole, Board Members, joined

I respectfully dissent.

The majority couches its ruling as a simple application of *Matter of Anderson,* 16 I&N Dec. 596 (BIA 1978), to an alien who would experience "extreme hardship" were he to return permanently to Nicaragua. The majority concludes that this is a "close case" which satisfies the "extreme hardship" test because it "meets the requirement of significant hardships over and above the normal economic and social disruptions involved in deportation."

It is, however, only through a generous application of the term "extreme" that the respondent's level of hardship today qualifies him for relief.

## I. THE MEANING OF "EXTREME HARDSHIP"

The majority properly starts with the factors set forth in *Matter of Anderson, supra,* for assessing extreme hardship claims. But *Anderson* only sets forth factors for examination. It does little in the way of providing *content* to the ambiguous phrase "extreme hardship."

Section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1994), does give latitude to the Board, as the Attorney General's delegate, in setting the parameters of extreme hardship. It specifically provides that the hardship must be extreme "in the opinion of the Attorney General." *Id*. Nevertheless, we are an administrative tribunal and we ought to strive for a faithful application of this statutory test.

In doing so, meaning must first be given to the actual language selected by Congress, including the word "extreme." The ordinary meaning of the word "extreme" can perhaps best be determined by considering the range of other adjectives that could have been used. Congress could have chosen the adjectives "some," "meaningful," "significant," "considerable," or "substantial," but it did not. Instead, it chose a stronger word than all of these, the adjective "extreme," which by common definition means "existing in a very high degree," "most advanced," or "very pronounced or excessive." *See Webster's New Collegiate Dictionary* 407 (1977). Congress used this strong word, and we must properly apply it.

The appropriateness of a literal or narrow construction is confirmed by the legislative history. Congress in 1952 intended to correct serious abuses it saw arising under the more generous terms of the predecessor suspension of deportation provisions. *See* S. Rep. No. 1137, 82d Cong., 2d Sess. 25 (1952); H.R. Rep. No. 1365, 82d Cong., 2d Sess. 62-63 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1718; S. Rep. No. 1515, 81st Cong., 2d Sess. 595-600, 609-11 (1950). In 1962, Congress further amended the statute to incorporate the current "extreme hardship" test. It thereby lessened the degree of hardship needed to qualify for relief in comparison to the original test of "exceptional and extremely unusual hardship." *Matter of Hwang*, 10 I&N Dec. 448, 452 (BIA 1964). The 1952 legislative history suggests that the qualifying hardship originally needed to reach the level of making deportation "unconscionable." S. Rep. 1137 at 25. The revision in 1962 receded from this level of severity. But the use of the word "extreme," especially when contrasted with other possible adjectives, is still consistent with the basic goal of the 1952 legislation, including markedly reducing the availability of relief for aliens who manage to remain here for a number of years or who acquire ordinary ties to United States citizens.

The earliest published administrative cases under the 1952 Act and the 1962 amendment that gave us the "extreme hardship" test reflect the normal uncertainty that can arise in giving concrete meaning to imprecise statutory language at the outset. They show that the Board usually granted suspension in strong cases, while it rejected claims in less than compelling cases. There are some early decisions that seem generous in the light of how the Board has applied the "extreme hardship" test over the last 20 to 25 years, starting shortly before *Matter of Anderson, supra*. Nevertheless, these initial cases show the importance of lengthy residence in, and very close family ties to the United States, as well as the countervailing significance arising from other means for adjusting an alien's status. *See, e.g., Matter of Wong*, 12 I&N Dec. 721 (BIA 1968); *Matter of Uy,* 11 I&N Dec. 159 (BIA 1965); *Matter of McCarthy,* 10 I&N Dec. 227 (BIA 1963); *Matter of P-*, 5 I&N Dec. 421 (BIA 1953).

The Board's movement toward a narrow view of extreme hardship is partially reflected in the cases described in the concurring opinion of Board Member Holmes. For example, the factual description in relation to the 1974 denial of relief in *Matter of Kim*, 15 I&N Dec. 88 (BIA 1974), reflects a stronger claim than is described in relation to the 1963 grant of relief in *Matter of Chien,* 10 I&N Dec. 387 (BIA 1963).

The Board's past narrow interpretation of "extreme hardship" has been upheld by the Supreme Court. *See INS v. Rios-Pineda*, 471 U.S. 444 (1985); *INS v. Jong Ha Wang*, 450 U.S. 139 (1981). Congress, moreover, has taken no steps to change this interpretation, in contrast to its action in the wake of the Supreme Court's interpretation of the "continuous physical presence" requirement for suspension. *See INS v. Phinpathya*, 464 U.S. 183 (1984); *see also* section 315(b) of Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, 3439 ("IRCA"), *amended by* sec. 2(q)(1) of the Immigration Technical Corrections Amendments of 1988, Pub. L. No. 100-525, 102 Stat. 2609, 2613-14. The Supreme Court's ruling in *INS v. Jong Ha Wang* does not dictate our construction of the statute. But this 1981 decision was in existence at the time Congress amended the suspension of deportation statute in response to the Court's 1984 *Phinpathya* ruling. That amendment did not touch the extreme hardship requirement.

Indeed, the respondent here does not even seem to have quite the degree of hardship reflected in the most generous Board cases from earlier years with parallel fact patterns. These cases also involved aliens who arrived during their teen-age years. While the aliens were a little older than the respondent upon their entries, they all had been in the United States about twice the minimum 7 years required by the statute. These aliens also had significant service in our Armed Forces, a factor of focus in those cases, which may have affected the dispositions. *E.g., Matter of Gee,* 11 I&N Dec. 639 (BIA 1966); *Matter of Lum*, 11 I&N Dec. 295 (BIA 1965); *Matter of Woo*, 10 I&N Dec. 347 (BIA 1963); *see also Matter of Huey*, 13 I&N Dec. 5 (BIA 1968)

(Congress did not approve suspension grant to alien who appears, at time of rejection, to have resided in U.S. for 13 years starting at age 16, and whose deportation likely would have been to a country, Taiwan, he had never even visited).[1]

It should also be apparent to close observers that the Board consistently construed the phrase "extreme hardship" more narrowly over the last two decades than it did in the first decade after the 1962 adoption of the "extreme hardship" test. *Cf. Cortes-Castillo v. INS*, 997 F.2d 1199, 1204 (7th Cir. 1993) (observing that the "exceptional and extremely unusual" hardship test has also become more stringent over the past 40 years). It is this now long-standing, narrow construction that was upheld by the Supreme Court.[2]

Congress deliberately used *extreme* language in requiring "extreme hardship." In view of the history behind the adoption of this test, the Supreme Court case law, and the administrative practice over the last 20 or more years, I see no justification for us to apply anything other than a plain meaning or narrow approach to the concept of extreme hardship.

This does not mean that relief is only available when the level of hardship becomes unbearable, or that we must be guided only by the harshest interpretations seen in past years. But we ought to be able reasonably to describe serious detriment before we can fairly characterize a set of circumstances as involving "extreme hardship." Within this overall frame of reference, I find the majority's explanation unpersuasive.

## II.  THE FACTS

The respondent presents a rather unremarkable claim of hardship. He arrived here 10 years ago in November of 1985, and he turned 14 the month after his arrival. His father preceded him by several months, and his mother and brother arrived within the same year. He went to school in California and has acquired fairly typical connections to both his local community and the nation as a whole.

Indeed, in many respects his ties at the time of the hearing were *less* than is often seen by aliens whose entire immediate family came here 10 years ago. His father passed away in 1994, his mother has returned to Nicaragua, and his brother was in Guatemala. He also has aunts and uncles in Nicaragua, as well

---

[1] For approximately 30 years, administrative grants of suspension of deportation were subject to congressional review and disapproval.  This finally ended when the Supreme Court declared the "one House veto" provisions of former section 244(c) of the Act, 8 U.S.C. § 1254(c) (1982), unconstitutional.  *INS v. Chadha,* 462 U.S. 919 (1983).

[2] Neither the majority nor any of the concurring opinions dispute the factual accuracy of the observation about Board practice in construing extreme hardship over the last two decades. The lack of Board precedent to support this assertion, noted in Board Member Holmes' concurrence, evidently arises from the very fact he earlier points out: "[I]n recent years the Board has provided little published guidance . . . address[ing] the 'extreme hardship' requirement . . . ."

as a step-sister he met only once. The "family unity considerations" found "relevant" by the majority pertain in part to the respondent's illegal alien fiancee, a permanent resident cousin in California, and the brother in Guatemala, whose bride-to-be was a permanent resident and had applied for citizenship about a month before the hearing.

The respondent's fiancee attended the hearing, but she did not testify. She is an asylum applicant, but we know very little about the nature of her claim or her presence here. The respondent did indicate that the only way for him to immigrate at this time was through any relief available in deportation proceedings. The respondent is also close to his California cousin, and he relies on telephone calls to his New York cousins if he needs help or to talk to someone.

There seems to be little doubt that the respondent has integrated himself into American society. While he has an expunged disorderly conduct violation, he plays baseball and softball, enjoys working out at the gym, helps at church, and has donated blood to the Red Cross and clothing to the Salvation Army. A return to Nicaragua does not appeal to him. The political and economic climate are far from ideal. In addition, the respondent indicated that his family departed in 1985 under stressful circumstances, with his father having been detained for 3 months evidently because of problems with Sandinista officials. Although the respondent was never threatened in Nicaragua, he was concerned about being pressed into military service because he was almost 14.

The respondent graduated from high school in Los Angeles in June of 1991, and he took several occupational courses until December of 1991. These allowed him to be employed as a security guard from 1992 until nearly 1994. It appears that he began driving his father's truck when his father returned to Nicaragua. The respondent wants to attend college in the United States because one of his dreams is to become a police officer.

### III.  THE MAJORITY's HARDSHIP RULING

The majority finds that the respondent's deportation to Nicaragua would cause him to suffer "significant" social and psychological hardship, apparently arising from the fact that he has "deeply immersed himself in the social and cultural life of the United States." It finds some additional hardship stemming from the political and economic conditions in Nicaragua, although it characterizes these potential hardships as "somewhat speculative." It also finds that "[f]amily unity considerations" are "relevant," but "do not add measurably to the hardship aspects of this case."

### A.  Social and Psychological Hardship

The majority has determined that the respondent is "fully assimilated into American culture and society." He has lived here over 10 years, including

some formative adolescent years. He did well in school and is fluent in English. He has worked here, and inherited his father's truck. He is deeply involved in church activities. He is a good athlete and is active in baseball and softball. He is also close to a cousin in Los Angeles and to his brother's fiancee.

I agree that these factors are of consequence. But the majority overstates the case in finding "significant hardship over and above the normal disruption of social and community ties" that would arise from the respondent's deportation.

Historically, the Board has treated family and length of residence as being generally of the greatest importance in suspension cases. Except in rare cases, community ties are of markedly less importance, and for good reason. Church and recreational affiliations are routinely changed by persons as they move for any number of reasons, such as employment, schooling, marital and family choices, and health reasons. It is not that these ties do not matter; it is that they very typically matter less than other considerations, so much so that for most persons the important decisions in life are only marginally swayed by community ties.

I doubt it would surprise anyone if the respondent left his friends, church, and adult sports teams in the Los Angeles area to go to college or take a position as a police officer in a distant city, should he realize his dream. Of course, he could be expected to find new friends, actively attend a new church, and join new teams. What is surprising is that these very ordinary community ties form the bulwark of the majority's position, as it finds that the speculative political and economic considerations add only "some additional weight," and the family unity considerations "do not add measurably" to the hardship.

The respondent did spend some formative years in the United States. He also spent some formative years in Nicaragua, and the majority makes no claim that he is a stranger to Nicaraguan society or culture. He was nearly 14 when he arrived here. His family came at about the same time, and he thus continued to be raised in a family with a Nicaraguan heritage at the same time that both he and other members of his family were adjusting to life here. He is as proficient in written and spoken Spanish as he is in English. The fact that he is "fully assimilated into American culture and society" does not mean that he would have any difficulty quickly assimilating once again into Nicaraguan culture and society. Indeed, given the presence of his mother and other extended family members in Nicaragua, he would very likely adjust to life there nearly as rapidly as he would in a move to another American city.

## B. Economic and Political Considerations

The majority states that the "respondent helped his father to develop and operate an independent trucking business which he continued to manage

after his father's death." It also credits the respondent's testimony that he could not establish a similar business in Nicaragua.

The respondent does own a truck, but he does not employ anyone else. Nor does he own any additional property, aside from his personal belongings and his car. It appears either that he drives for another business as an independent contractor, or that he obtains independent trucking assignments through some sort of brokerage or dispatching company. The $13,000 income noted by the majority was the respondent's gross income in 1994. After insurance, maintenance, and other expenses, his net income was $5,310.00.

The record does indicate that the respondent inherited his father's truck, and that driving this truck is what the respondent did for a living at the time of the hearing. The record does not show that he helped to "develop" this business, and it is not clear what he must do to "manage" it now, aside from driving and maintaining the truck. The Immigration Judge was correct in according this "business" no special weight. From the record, it appears to be little more than ordinary employment in the United States. Every indication suggests that a sale of the truck, by itself, would completely liquidate the "business."

Owning and driving a truck is an honest way to make a living, and it is likely that a return to Nicaragua will entail some financial hardship. But in this respect the respondent faces no more than the loss of what amounts to a job that earned him a little over $5,000, which was $2,000 *below* the poverty guideline for a family of one in 1994. 59 Fed. Reg. 6277 (1994). It is understandable why the respondent testified that he wants to become a police officer.

With respect to political problems, the respondent testified that he was never threatened in Nicaragua, but that he was facing possible military conscription as he was approaching age 14 when he left. The State Department report included in the record and relied on by the majority discloses that the military draft has been abolished in Nicaragua and that "there have been no reports of . . . Sandinista mistreatment of those who avoided . . . military service." Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Nicaragua - Profile of Asylum Claims & Country Conditions* (Jan. 1995). There has been no showing that the problems experienced by the father have affected the mother since her return or would affect this respondent should he return. The majority states, but fails to explain why "the current political situation in Nicaragua should be factored into the hardship assessment." It is also not evident from the majority's opinion exactly how it has factored this element into the analysis, if at all.

## C. Family Unity Considerations

The majority finds that the respondent has "relatively weak family ties in the United States" and declares that "while relevant, [they] add little to the

overall assessment of hardship." It is unclear why the majority assigns *any* weight to the family ties factor, except as to the California cousin who is lawfully present here and is properly given weight as a friend elsewhere by the majority. The majority gives some minimal, but relevant weight to the respondent's ties to his fiancee and to his brother in Guatemala who at the time of the hearing planned to return to his own fiancee. These persons, however, enjoyed no lawful immigration status, and one of the two was not even in the United States at the time of the hearing. The immigration judge did not accord any weight to the respondent's separation from either the brother in Guatemala or the fiancee asylum applicant.

While there seems to be a paucity of published cases on point, I have not found a case in which the Board previously accorded hardship weight to an alien's *separation* from other unlawful residents or intending unlawful residents of the United States. The issue, however, has been addressed in the suspension of deportation context in unpublished Board orders. The decision of the United States Court of Appeals for the Ninth Circuit in *Alvarez-Madrigal v. INS,* 808 F.2d 705 (9th Cir. 1987), quotes from one such order and upholds the Board's refusal to accord hardship weight to separation from illegal alien relatives. There, the Board stated:

> We will not assume that his family members will remain here indefinitely in an illegal status, although that might be their intention. It may well be that if the respondent is allowed to remain in the United States, he will be separated from his family members who cannot remain here. Also, it would be contrary to the policy of the immigration laws to allow an alien to obtain an advantage through the presence of relatives illegally in the United States.

*Id*. at 707. As this passage indicates, the absence of lawful status for a friend or relative greatly complicates any assessment of potential hardship from separation. The friend or relative may not ultimately be permitted to remain here, causing separation hardship if the alien suspension applicant stays behind while the friend or relative is deported. There is the potential for "bootstrapping" claims upon each other, as well as the policy concerns noted by the Board, as quoted in *Alvarez-Madrigal*.

According hardship weight to separation from persons unlawfully in the United States, or intending an unlawful presence here, is an unwise and unexplained departure from past practice.

## IV. CONCLUSION

The majority is not convincing in its claim that the respondent has demonstrated "significant hardships over and above the normal economic and social disruptions involved in deportation." It finds "extreme hardship" arising from rather ordinary community ties, assimilation into American culture, and unnoteworthy economic hardship. While not inconsequential, this overall level of hardship is not "extreme" under a plain meaning test, which even by dictionary definition would require a showing that the hardship exists in a very high degree, is most advanced, or is very pronounced or excessive.

This does not mean that the ambiguous phrase "extreme hardship" is unbending or only applies where the consequences are draconian. But the Board long ago resolved the ambiguity in the statutory language in favor of a narrow construction that mandated strong showings of hardship to obtain relief. That resolution has been followed for several decades, and has been approved by the courts. While not a generous view, it is consistent with the literal language of the statute and with the concerns leading to this statutory restriction on suspension of deportation. The respondent's level of hardship cannot properly be deemed "extreme."