# In re Martha ANDAZOLA-Rivas, Respondent

File A91 431 733 - Phoenix

*Decided April 3, 2002*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The respondent, an unmarried mother, did not establish eligibility for cancellation of removal under section 240A(b) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b) (2000), because she failed to demonstrate that her 6- and 11-year-old United States citizen children will suffer exceptional and extremely unusual hardship upon her removal to Mexico.

(2) The factors considered in assessing the hardship to the respondent's children include the poor economic conditions and diminished educational opportunities in Mexico and the fact that the respondent is unmarried and has no family in that country to assist in their adjustment upon her return.

FOR RESPONDENT: Christopher J. Stender, Esquire, Phoenix, Arizona

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Barry O'Melinn, Appellate Counsel

BEFORE:   Board En Banc:  SCIALABBA, Acting Chairman; DUNNE, Vice Chairman; HOLMES, HURWITZ, FILPPU, COLE, GRANT, MILLER, OHLSON, HESS, and PAULEY, Board Members.  Dissenting Opinions:  ESPENOZA, Board Member, joined by ROSENBERG, Board Member; OSUNA, Board Member, joined by SCHMIDT, VILLAGELIU, GUENDELSBERGER, ROSENBERG, MOSCATO, and BRENNAN,  Board Members.

HURWITZ, Board Member:

In a decision dated March 16, 2000, an Immigration Judge granted the respondent's application for cancellation of removal under section 240A(b) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b) (2000), and certified his decision to us for review.  In addition, the Immigration and Naturalization Service filed an appeal from the Immigration Judge's grant of relief.  Oral argument was heard before a panel of the Board on June 22, 2001.  The Service's appeal will be sustained and the respondent will be granted voluntary departure in lieu of removal.

The parties in this case agree that the respondent has both the continuous physical presence and the good moral character required for cancellation of removal under section 240A(b) of the Act.  The only issue on appeal is

whether her removal from the United States would result in "exceptional and extremely unusual hardship" to her two United States citizen children, which is also required for relief under that section. The Immigration Judge found that the necessary hardship had been shown, but the Service disagrees.

The record reflects that the respondent is a 30-year-old native and citizen of Mexico who entered the United States without inspection in August 1985. She has two United States citizen children, aged 11 and 6. The respondent has had the same employment for 4 years with a company that provides health insurance for her and her family, as well as a 401K retirement savings plan. The respondent bought her own house, valued at $69,000, in 1998. She owns two vehicles, with a combined value of about $12,000. According to her testimony, she also has savings of about $7,000.

The respondent testified that she has no relatives in Mexico who could help her with the children, should she be forced to return there. She further stated that her mother takes the children to school and looks after them while she works. All of the respondent's siblings live in this country, without valid immigration status, as do her aunts and uncles. The respondent's older child testified to her very close relationship with her grandmother. She did not indicate that she is close to any other relatives in this country.

Although the respondent is not married, when asked at the hearing about the father of her children, she replied, "We're okay, we just live together." She indicated that he has "some form of temporary permit" in this country. Asked if he contributes to the household, the respondent said, "He's working construction so sometimes he does have a job, sometimes he doesn't."

The respondent described the children's health as "fine." She stated that she has had problems with asthma, which is under control, but that this condition would prevent her from working in the fields in Mexico. She also does not believe she could get an office job in Mexico, as she has only a sixth grade education. She is concerned that she would not be able to obtain any employment in Mexico that would be comparable to the job she has here.

The respondent also stated that the schools are better in this country than in Mexico, with better facilities and supplies, and access to computers. She is afraid that her children would not be able to get much education in Mexico, especially when they get older and reach the point where she would have to pay for it.

The respondent testified that the main focus of the family's social life is the church they attend every week. She also stated that she helps out twice a month at her younger child's Head Start program.

Following the removal hearing, the Immigration Judge entered his decision granting the respondent's application for cancellation of removal. The Immigration Judge concluded, after a lengthy discussion, that the "United States citizen children, particularly Tanya [the 11-year-old], would suffer hardship of an emotional, academic and financial nature." This hardship

"would be of a daunting level." The Immigration Judge noted that the children would be uprooted from their current "nurturing environment" and from their support system. He also stated that they would face discrimination in Mexico because they are children of a single mother. The Immigration Judge emphasized the fact that Tanya has little knowledge of "academic Spanish" and might therefore be placed in a lower grade in school in Mexico. In addition, he expressed concern that the children may not be able to stay in school, but rather may have to work to help support the family. He noted that the respondent has a steady, full-time job here, with good benefits.

Based on these considerations, the Immigration Judge found that the children "face complete upheaval in their lives and hardship that could conceivably ruin their lives." He concluded that such hardship would be "unconscionable," and he therefore concluded that the respondent had met the exceptional and extremely unusual hardship requirement.

After the Immigration Judge rendered his decision in this case, but before oral argument was held, we issued a precedent decision addressing the meaning of the term "exceptional and extremely unusual" hardship as used in the cancellation of removal statute. In *Matter of Monreal*, 23 I&N Dec. 56, 65 (BIA 2001), we held that an applicant for cancellation under section 240A(b) of the Act must demonstrate that his or her removal would cause hardship to his or her qualifying relatives that is "substantially different from, or beyond, that which would normally be expected from the deportation of an alien with close family members here."

In *Matter of Monreal*, *supra*, the respondent was a 34-year-old man from Mexico who had lived in this country since 1980. He had three United States citizen children. The two older children were 12 and 8 years old, and they lived with the respondent in the United States. His youngest child, an infant, had returned to Mexico with the respondent's undocumented wife shortly before his removal hearing. The respondent's lawful permanent resident parents also lived near him.

We concluded that the respondent in *Matter of Monreal*, *supra*, had not shown that his children or his lawful permanent resident parents would suffer exceptional and extremely unusual hardship if he was removed from the United States. We recognized that the respondent's children would suffer some hardship if they accompanied their father to Mexico, and that they would likely have fewer opportunities there. However, emphasizing the high bar Congress had imposed in enacting the "exceptional and extremely unusual hardship" requirement, we concluded that the bar had not been reached.

The respondent asserts that her case is "completely distinguishable from *Monreal*." She argues that, unlike the respondent in *Monreal*, she is a single mother who is the sole support of her United States citizen children. She has no family able to help her in Mexico. She claims that single mothers face discrimination in Mexico that will make it even more difficult for her to

provide a decent life for her children in that country. The respondent argues that women do not enjoy equal rights in Mexico. They are paid less and generally hold lower level jobs. There is "institutionalized discrimination against women," and a single mother returning to this environment would face a particularly difficult time trying to support her children. She also points out that in *Monreal*, the respondent's deportation to Mexico was actually going to reunite him with his family, as his wife and one of his children had already moved there.

The respondent further argues that the Board should not approach this case with the assumption that there are many other Mexicans whose situation is similar to hers, and that the hardship she presents therefore does not rise to the level of "exceptional and extremely unusual." The respondent asserts that her case, like all others, must be decided on its particular facts.

The Service, on the other hand, argues that the instant case is "squarely governed" by *Matter of Monreal*, *supra*. If anything, the Service claims, this case is weaker than that in *Monreal* because the respondent's United States citizen children are younger and would therefore have an easier time adapting to life in Mexico. The Service also asserts that this respondent's return to Mexico would be somewhat easier because she is not penniless, but has some assets that would enable her to "set up a better life for her children than many returnees."

The Service contends that the hardship presented by the respondent is similar to that of many Mexican nationals who sought suspension of deportation under the previous law, and who were found not to have met even the former "extreme hardship" standard. Finding nothing "unusual, unique, or exceptional" in this case, the Service asserts that the respondent is in the same position as hundreds, if not thousands, of other Mexican nationals who have spent a considerable period of time in this country. According to the Service, the Immigration Judge's decision granting cancellation of removal should therefore be overturned.

We are sympathetic to the respondent's case and to her situation. We have no doubt that she and her children will suffer some hardship upon moving to Mexico. Indeed, as with *Matter of Monreal*, *supra*, we believe that, were this a suspension of deportation case, where only "extreme hardship" must be shown, we might well grant relief. In this regard, we note that the cases cited by the respondent at oral argument, and in her brief, address the meaning of "extreme hardship," not "exceptional and extremely unusual hardship." *See, e.g.*, *Salcido-Salcido v. INS*, 138 F.3d 1292 (9th Cir. 1998); *Gutierrez-Centeno v. INS*, 99 F.3d 1529 (9th Cir. 1996); *Casem v. INS*, 8 F.3d 700 (9th Cir. 1993). However, Congress has now imposed a standard of hardship that is significantly more burdensome than the former "extreme hardship" standard. We simply cannot find that she has met the very high standard of the current law.

We also accept the respondent's contention that her case must be considered on its own individual facts. We note, however, that the relative level of hardship a person might suffer cannot be considered entirely in a vacuum. It must necessarily be assessed, at least in part, by comparing it to the hardship others might face.

We have considered the evidence in the record regarding the poor economic conditions in Mexico, and the respondent's claim that her deportation would result in drastic economic consequences to her and her children. We do not dispute the fact that economic conditions in Mexico are worse than those in this country. However, it has long been settled that economic detriment alone is insufficient to support even a finding of extreme hardship. *See Matter of Pilch*, 21 I&N Dec. 627 (BIA 1996), and cases cited therein.

We have also considered the respondent's claims regarding educational opportunities for her children. She stated that until 1995, the Mexican Government did not authorize undocumented aliens to attend their schools, and that even now the availability of education to undocumented aliens varies from state to state. She noted further that although the Mexican Government aspires to provide 9 years of education to every child, it has not actually been able to implement this goal. Again, we recognize that Mexico likely will not provide the respondent's children with an education equal to that which they might obtain in the United States. However, the respondent has not shown that her children would be deprived of all schooling or of an opportunity to obtain any education.[1]

The fact that the respondent has no family to help her in Mexico will likely make her adjustment to a new life there more difficult. However, we note that, with the exception of her mother, who appears to have temporary resident status under the Special Agricultural Worker program, her siblings are undocumented. In assessing hardship, we should not consider the fact that the respondent's extended family is here illegally, rather than in Mexico, as a factor that weighs in her favor. Further, there is nothing to prevent the respondent's family members from sending financial support to her in Mexico, should it be needed.

---

[1] We note Board Member Espenoza's comment in her dissenting opinion that our findings regarding educational opportunities in Mexico are "internally inconsistent." We do not find it inconsistent to recognize that educational opportunities are likely to be fewer in Mexico than in the United States, while also stating that there has been no showing that the respondent's children would be unable to obtain any education in Mexico. Further, we are fully aware of the importance of education to any child's future. However, a finding that diminished educational opportunities result in "exceptional and extremely unusual hardship" would mean that cancellation of removal would be granted in virtually all cases involving respondents from developing countries who have young United States citizen or lawful permanent resident children. This view is not consistent with congressional intent.

In addition, the respondent testified that the father of her children lives with her, and that he works in construction and sometimes contributes to the family's support. Although the respondent characterizes herself as a single mother, her testimony reflects that her children's father has not abandoned them, but lives with the family. As it is clear that the father has been a part of the children's lives, it is also certainly possible that he could provide them some support in Mexico, if necessary.

We also consider it significant that the respondent has accumulated some assets in this country. She owns a home and two vehicles, has participated in a retirement plan, and has savings of about $7,000. Although the house presumably carries a mortgage, the respondent and her children would not be penniless upon her return to Mexico. The money she does have would surely help her in establishing a new life in Mexico.

Finally, we do not doubt that the respondent and her children may face some special difficulties in Mexico, because she is an unmarried mother. The evidence presented does suggest that women still do not have equal opportunities in Mexico, and it may be that the respondent will encounter some discrimination as an unmarried mother, in addition to the challenges that unmarried parents everywhere face. However, even considering the potential hardship caused by the respondent's status as an unmarried mother, together with the other hardships described above, we must conclude that she has not met her burden of establishing that her children will suffer exceptional and extremely unusual hardship if she is removed to Mexico.

The respondent in this case is young and able to work. Although she reports suffering from asthma, that condition is apparently under control. She has developed some job skills. She does have some financial assets that will aid her in establishing a new life in Mexico. Her children are still relatively young and are in good health. While they certainly will face some problems in adapting to life outside the United States, they will likely be able to make the necessary adjustments.

In sum, we cannot meaningfully distinguish this case from that of *Matter of Monreal*, *supra*. While almost every case will present some particular hardship, the fact pattern presented here is, in fact, a common one, and the hardships the respondent has outlined are simply not substantially different from those that would normally be expected upon removal to a less developed country. Although the hardships presented here might have been adequate to meet the former "extreme hardship" standard for suspension of deportation, we find that they are not the types of hardship envisioned by Congress when it enacted the significantly higher "exceptional and extremely unusual hardship" standard. Accordingly, we will sustain the Service's appeal from the Immigration Judge's grant of cancellation of removal. There being no adverse factors present, we will grant the respondent a period of voluntary departure in lieu of an order of removal.

**ORDER:**  The appeal of the Immigration and Naturalization Service is sustained.

**FURTHER ORDER:** The decision of the Immigration Judge is vacated.

**FURTHER ORDER:**  In lieu of an order of removal, the respondent is allowed to voluntarily depart from the United States, without expense to the Government, within 30 days from the date of this order or any extension beyond that time as may be granted by the district director.  In the event the respondent fails to so depart, the respondent shall be ordered removed from the United States.

**NOTICE:**  If the respondent fails to depart the United States within the time period specified, or any extensions granted by the district director, the respondent shall be subject to a civil penalty of not less than $1,000, and not more than $5,000, and shall be ineligible for a period of 10 years for any further relief under section 240B and sections 240A, 245, 248, and 249 of the Immigration and Nationality Act.  *See* section 240B(d) of the Act.

*DISSENTING OPINION:*  Cecelia M. Espenoza, Board Member, in which Lory Diana Rosenberg, Board Member, joined

I join the dissenting opinion of Board Member Osuna.  I write separately to address the reasons why Congress' mandate that hardship is to be determined only by looking at the effect on qualifying relatives who are United States citizens or lawful permanent residents reflects Congress' principal concern with the impact on stakeholders in United States society. *See* section 240A(b)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b)(1) (2000).

Taking the majority opinion to its inevitable conclusion, it appears that no United States citizen child of a Mexican national will be able to demonstrate exceptional and extremely unusual hardship because he or she is deprived of educational opportunities for financial reasons.  In fact, under the interpretation announced today, it is more than likely that no respondent from Mexico will qualify for cancellation unless the qualifying relative has severe medical problems.  I do not believe that was the directive of Congress.  Nor is it consistent with our decision in *Matter of Monreal*, 23 I&N Dec. 56, 60 (BIA 2001), in which we rejected an "unconscionable standard" as higher than required.

At the same time that Congress heightened the hardship standard from "extreme hardship" to "exceptional and extremely unusual hardship," it added additional restrictions.[1]  In light of these other restrictions, implementing

---

[1]  It is beyond dispute that cancellation of removal is governed by a new standard, which requires a showing that the undocumented alien (1) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of

(continued...)

Congress' intent need not be accomplished solely by imposing the most narrow reading of the exceptional and extremely unusual hardship standard. Although Congress said that the change was made "to emphasize that the alien must provide evidence of harm to his spouse, parent, or child substantially beyond that which ordinarily would be expected to result from the alien's deportation," H.R. Conf. Rep. No. 104-828, at 213 (1996), Congress did not enact provisions to categorically preclude any nationality from this relief.[2] Thus, our construction of this provision should not result in categorical exclusion of any nationality.

The majority opinion appears to measure the hardship prong as if that were the only way in which Congress restricted eligibility for relief. In doing so, the majority fails to acknowledge the significance of the statutory language that directs us to focus on the hardship to qualifying relatives. The issue is whose hardship Congress has directed us to examine and under what circumstances that hardship rises to a level substantially beyond that which ordinarily would be expected to result from the alien's deportation.

By eliminating the relevance of hardship to the respondent, Congress directed us to focus on the exceptional and extremely unusual hardship to the United States citizen or lawful permanent resident who would be affected by the removal of the alien. In determining exceptional and extremely unusual hardship, our assessment of the hardship to United States citizen children must take into account both the present and the future impact that ordinarily would be expected to result from their accompanying the respondent upon removal. The repercussions that emerge as a consequence of the deprivation of the opportunity to receive an education in the United States should not be diminished when evaluating the United States citizen children's forcible return to Mexico.

---

[1] (...continued)
application; (2) has been a person of good moral character during such period; (3) has not been convicted of specified criminal offenses; and (4) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence. Section 240A(b)(1) of the Act; *see also* 8 C.F.R. § 240.20 (2001). It is also generally accepted that Congress enacted the standard it did in response to *Matter of O-J-O-*, 21 I&N Dec. 381 (BIA 1996); *see also* H.R. Conf. Rep. No. 104-828 (1996).

[2] Congress knows how to define relief in ways that advantage or disadvantage certain nationalities. *See, e.g.*, Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193, *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA") (providing adjustment of status only for Nicaraguan and Cuban immigrants, and extending eligibility for suspension of deportation only for certain nationalities); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (disadvantaging certain nationalities in the allocation of diversity visas); Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (including special provisions for Cuban and Haitian immigrants; *cf.* Act of Oct. 3, 1965, 79 Stat. 911 (eliminating the national origins quota system, which had precluded immigration from Asia and Latin America).

To adequately address whether the respondent's United States citizen children will face exceptional and extremely unusual hardship, we must look at both the conditions of the educational opportunities in Mexico *and* the loss of educational opportunities in the United States. The majority has failed to properly evaluate the differences in educational opportunities.

In *Plyler v. Doe*, 457 U.S. 202, 221-22 (1982), the United States Supreme Court acknowledged the importance of the United States educational process. In *Plyler*, the Court refused to deny public education to undocumented alien children, acknowledging the critical importance of "education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child." *Id.* at 221 (distinguishing education as more than merely a public benefit). As the Court recognized, "'[A]s . . . pointed out early in our history, . . . some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence.'" *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972)). The Court concluded that

> education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.

*Plyler v. Doe*, *supra*, at 221.

The Court emphasized that "'education prepares individuals to be self-reliant and self-sufficient participants in society.'" *Id.* at 222 (quoting *Wisconsin v. Yoder*, *supra*, at 221). Nevertheless, under the majority opinion, the loss of such an education is insufficient to constitute exceptional and extremely unusual hardship. The future cost, however, will be a citizen who is permanently handicapped and thus less capable than others of engaging in the political process.

I do not contend that the *Plyler* Court's evaluation of the significance of an American public education in insuring acculturation to the American ideals trumps the language used by Congress in section 240A(b) of the Act and requires a grant of cancellation of removal in the case of every Mexican national having school-age children. However, the critical importance of such an education cannot be ignored. The rationalization that a United States citizen child can always return to the United States when he or she reaches the age of majority begs the question.

In the case before us, the Immigration Judge found explicitly that "[the child's] education would either terminate due to her insufficient knowledge of Spanish or she would struggle academically in a school which is far inferior to that she is currently attending." The Immigration Judge specifically ruled that "either way, this U.S. citizen child would be denied

significant educational opportunities which could secure a decent future . . . [and] such a denial would greatly limit [her] employment and educational options if she decided to return to the United States."

Nothing in the majority opinion reflects that the majority properly considered or weighed the detailed factual findings relating to the children's loss of educational opportunities that were made by the Immigration Judge. Rather, without identifying any error in the findings of the Immigration Judge, the majority substituted its own factual findings that the educational opportunities would be diminished but not eliminated altogether.

Moreover, even if it were proper for us to make findings de novo on appeal, the majority opinion is internally inconsistent. One the one hand, the majority states that "the respondent has not shown that her children will be deprived of all schooling or of an opportunity to obtain any education." *Matter of Andazola*, 23 I&N Dec. 319, 323 (BIA 2002). On the other hand, the majority acknowledges that "until 1995, the Mexican Government did not authorize undocumented aliens [such as the respondent's children] to attend their schools" and that "although the Mexican Government aspires to provide 9 years of education to every child, it has not actually been able to implement this goal." *Id.*

In *Plyler v. Doe*, *supra*, at 222 n.20, the Court recognized that the possibility that only a small proportion of the undocumented children would become citizens "is not decisive, even with respect to the importance of education to participation in core political institutions." As United States citizens, the children in this case have an unquestionable stake in obtaining an education that will allow them to participate meaningfully in their country of citizenship. Thus, the majority's conclusion that the children's loss of educational opportunities is a hardship that is not "substantially different from those that would normally be expected upon removal to a less developed country" blatantly disregards the critical importance of an American education and the future consequences to these children that flow from the deprivation of such an education. *Matter of Andazola*, *supra*, at 324. In reaching such a conclusion, the majority has overlooked the specific language used by Congress, which zeroes in specifically on the impact of removal on the stakeholders.

The decision to remove these citizen children will undoubtedly diminish their ability to be self-reliant and self-sufficient. Whatever the educational opportunity that might exist in Mexico, it will be substandard to that which would exist here. Indeed, "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Plyler v. Doe*, *supra*, at 223. In short, the removal of the United States citizen children in this case is not merely a return to a country with a lower standard of living and a poor educational system. It is, in essence, a method of depriving the citizen children of the valued education that they currently

enjoy in the United States. This, in turn, is likely to result in a lifetime hardship that deprives the children of an opportunity to obtain the skills necessary to meaningfully participate "effectively and intelligently in our open political system." *Wisconsin v. Yoder*, *supra*, at 221.

The Immigration Judge correctly aggregated the economic, educational, and emotional consequences to the United States citizen children to find exceptional and extremely unusual hardship that would be unconscionable in the event of their mother's removal. I agree, and note that hardship that is unconscionable is a greater degree of hardship than we interpreted the statute to require in *Matter of Monreal*, *supra*. Therefore, I dissent.

*DISSENTING OPINION*: Juan P. Osuna, Board Member, in which Paul W. Schmidt, Gustavo D. Villageliu, John Guendelsberger, Lory Diana Rosenberg, Anthony C. Moscato, and Noel Ann Brennan, Board Members, joined

I respectfully dissent. While this is a close case, in my view the respondent has shown that her United States citizen children would suffer exceptional and extremely unusual hardship if she is removed from this country. I would dismiss the Immigration and Naturalization Service's appeal and affirm the Immigration Judge's grant of cancellation of removal.

This case requires us to apply the "exceptional and extremely unusual hardship" standard that Congress created as part of section 304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-594, and codified at section 240A(b)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b)(1) (2000). That provision allows cancellation of removal for an alien who has been physically present in the United States for at least 10 years, has been a person of good moral character, has not been convicted of specific criminal offenses, and who establishes that removal would result in "exceptional and extremely unusual" hardship to the alien's spouse, parent, or child who is a United States citizen or an alien lawfully admitted for permanent residence.

Determining what constitutes "exceptional and extremely unusual hardship" presents a challenge for adjudicators. Reasonable persons can differ on whether a given set of circumstances rises to the requisite hardship. What is clear, however, is that each hardship case, to a large extent, succeeds or fails on its own merits and on whether an applicant for relief is able to present testimony and documentation that is sufficiently compelling to demonstrate exceptional and extremely unusual hardship. For the reasons set forth below, I believe that the respondent in this case has succeeded in doing so.

## I. *MATTER OF MONREAL* AND THE PRESENT CASE

In *Matter of Monreal*, 23 I&N Dec. 56 (BIA 2001), we considered for the first time in a precedent decision the exceptional and extremely unusual hardship standard, by examining the application for cancellation of removal of a 34-year-old Mexican national who was the father of three United States citizen children. In that decision, we held that to establish exceptional and extremely unusual hardship under section 240A(b) of the Act, an alien must demonstrate that his or her spouse, parent, or child would suffer hardship that is substantially beyond that which would ordinarily be expected to result from the person's departure. We specifically stated, however, that the alien need not show that such hardship would be of such magnitude that his or her deportation would be "unconscionable" in its effect on a qualifying relative. *Matter of Monreal*, *supra*, at 60. After reviewing the case, we dismissed the respondent's appeal from an Immigration Judge's finding that he had not satisfied the new hardship standard. The majority finds that the present case cannot be meaningfully distinguished from *Matter of Monreal*, *supra*. I find, to the contrary, that this case is wholly distinguishable from *Matter of Monreal*.

In *Matter of Monreal*, the respondent was the father of three citizen children, the oldest two being 12 and 8 years of age. The respondent had been working for 10 years for his uncle's business, but acknowledged that he had a brother living in Mexico who also worked for the uncle's business. Our decision emphasized that the respondent was in good health, was able to work, and would, in fact, be reunited with family members upon his return to Mexico. Most significantly, we noted that the respondent's wife, the mother of the three children, had already returned to Mexico, and the respondent would be joining her there if removed. *Matter of Monreal*, *supra*, at 64.

In the present case, by contrast, the respondent is a single mother who has no close relatives remaining in Mexico.[1] In this country, she owns her own

---

[1] The majority casts doubt on whether the respondent truly is a single mother, pointing to an exchange during the testimony indicating that the children's father may at times be a presence in their lives. However, the Immigration Judge, as the fact finder in this case, determined that the respondent is a single mother. Nowhere in his decision is there any indication that the Immigration Judge found the children's father to be a significant presence in their lives. Moreover, during the hearing the Immigration Judge repeatedly referred to the respondent as a "single mother," and supporting documents in the record confirm that status. In both its pretrial and appellate briefs, the Service makes no mention of a father, and on the Notice of Appeal (Form EOIR-26) it mentions the presence of "many uncles and cousins in the Phoenix area" and a "maternal grandmother," but not the father. In fact, it was only at oral argument that the Service argued that the father is a "continuing and real presence" in the lives of the children.

Despite the Immigration Judge's findings, and the factual weight of the record, the majority speculates that the father's presence is such that the respondent is not truly a single mother.

(continued...)

home and has steady employment with good benefits, including a retirement plan and health insurance for herself and her children. She depends on the help of her mother to look after the children when she works. With only a sixth grade education and a history of asthma, the respondent quite reasonably fears that she will be unable to find employment in Mexico that will enable her to support her children by herself. While I do not minimize the difficulties that the family in *Matter of Monreal* will face in Mexico, they are in my view vastly different from the difficulties that this respondent and her children will face upon their return there.

I am of course cognizant of the fact that, unlike the former "extreme hardship" standard for suspension of deportation, which was discussed most recently in *Matter of Kao and Lin*, 23 I&N Dec. 45 (BIA 2001), under the cancellation statute we can consider only the hardship to the respondent's qualifying relatives, and not to the respondent herself. Some factors that we may have considered under the extreme hardship standard as pertaining *solely* to an applicant for suspension of deportation may not be relevant for cancellation of removal purposes. However, as we recognized in *Matter of Monreal*, *supra*, other factors may be considered if they affect the hardship of the qualifying relative, and assessment of which factors are relevant and which are not must be undertaken on a case-by-case basis.

In many cases, it is artificial and defies logic to attempt to consider the relatives' hardship without some consideration of the hardship to the respondent. In a family unit, hardship on a parent essentially translates to hardship on the rest of the family. This is particularly true where the respondent is the parent of minor children. The hardship is further magnified when, as here, the family has only one parent, who must shoulder the burden of caring and providing for the children by herself. In the present case, we would be removing a single mother with no significant job skills to a poor, developing country where she has no family to help her. The hardships she will encounter will most certainly accrue to her children. For example, the respondent's difficulties in finding a place to live and finding the type of employment that will enable her to support her children will greatly add to the hardships the children will already face in adjusting to an unknown country.

I emphasize that, unlike many other cases, we are not talking here about a two-parent family where at least one of the parents has a professional, university, or even secondary level of education. Here, the respondent is a

---

[1] (...continued)

In my view, the more appropriate course is to rely on the Immigration Judge's fact finding that the father is not a significant presence and that this respondent is a single mother responsible for two United States citizen children. According to the Immigration Judge, "The Court shares the respondent's concern and finds it unlikely that the respondent, *a single mother in Mexico*, would be able to adequately provide for her United States citizen children." (Emphasis added.)

single mother who was forced to leave school when she was 13 years of age, and who consequently has only been able to work in relatively low-paying jobs.  Such jobs in the United States may provide enough income and benefits to support a family of three.  In Mexico, it is much harder or even impossible to do so.  It is not a stretch to find that a family placed in that position would face "exceptional and extremely unusual hardship," especially where there is no evidence that they could rely on a family structure already in place in Mexico.

## II.  NINTH CIRCUIT CASE LAW

It is also significant that this case arises within the jurisdiction of the United States Court of Appeals for the Ninth Circuit, whereas *Matter of Monreal*, *supra*, arose in the Fifth Circuit.  The Ninth Circuit has made it clear that in assessing hardship, we are required to consider all factors presented, including economic conditions and lack of family ties in the country of return.  I recognize that Ninth Circuit case law involves the extreme hardship requirement under the former suspension of deportation statute, not the present exceptional and extremely unusual hardship standard for cancellation of removal.  However, because assessments of "hardship" are essentially factual, it is appropriate to look to similar contexts for factors to consider.  *See generally Osuchukwu v. INS*, 744 F.2d 1136, 1140 (5th Cir. 1984).[2]  It is therefore proper to look to Ninth Circuit precedent for guidance on how to weigh hardship generally, in cases arising in that circuit.

In *Gutierrez-Centeno v. INS*, 99 F.3d 1529 (9th Cir. 1996), the respondents were a single mother and her two minor children.  The court chastised the Board for not adequately considering the fact that the respondents had significant family ties in the United States and no real ties remaining in their native Nicaragua.  The court emphasized that the adult respondent was a single mother supporting two children who would be returning to an economically deprived country.  The court also held that the Board should have considered the fact that the children (who were also suspension applicants, not United States citizens or lawful permanent residents) would likely face difficulty in adjusting to life in Nicaragua.  In facts reminiscent of those in the present case, the court was particularly concerned about the children's education, especially the younger child who could barely read or write Spanish.

In *Tukhowinich v. INS*, 64 F.3d 460 (9th Cir. 1995), the court found that the Board failed to consider political unrest in Thailand, again emphasizing that conditions in the country of return are important in assessing hardship.  In that case, the court also noted that it was not necessary for the respondent

---

[2]  Once the hardship factors are identified, a separate assessment must follow as to whether they rise to the required hardship level.

to show that she would be completely unemployable in Thailand. It pointed out that with her good job in the United States, the respondent had become the sole support of her parents and other family members in Thailand. It found that her inability to continue to fulfill her duty of supporting her family would be a severe psychological hardship resulting from the economic loss. In so finding, the court noted that "'the personal hardships that flow from the economic detriment,'" *id.* at 463 (quoting *Ramirez-Gonzalez v. INS*, 695 F.2d 1208, 1211 (9th Cir. 1983)), are a factor to consider in assessing hardship, and the Board "should have considered the implications of her economic loss." *Id.* at 464. As in *Tukhowinich*, the respondent in this case would face devastating economic detriment in Mexico, and that factor, because it also affects the citizen children, needs to be carefully considered.

The Ninth Circuit has also consistently held that although the birth of United States citizen children is not sufficient in itself to warrant a finding of extreme hardship, the effect of deportation on citizen children must be very carefully considered. *See, e.g.*, *Casem v. INS*, 8 F.3d 700 (9th Cir. 1993), and cases cited therein. In that case, the court also noted the difference between the adjustments required by very young children accompanying their parents to a new country and the adjustments faced by children already in school. Both of the citizen children in this case are now of school age, and the Immigration Judge noted, as the court did in *Gutierrez-Centeno v. INS*, *supra*, that they have little knowledge of "academic Spanish."

## III. CONGRESSIONAL INTENT

I recognize that, in enacting the cancellation statute, Congress intended to substantially narrow the class of aliens who would qualify for cancellation of removal, as opposed to those who qualified under the prior suspension statute. At oral argument in this case, the Service argued that the term exceptional and extremely unusual hardship should be strictly defined to fulfill Congress' intent in this regard, i.e., to make the class of aliens that would benefit from cancellation of removal much smaller than the class that benefited from suspension of deportation. *See* H.R. Conf. Rep. No. 104-828 (1996); *Matter of Monreal*, *supra*, at 59. The Service's argument has merit, and I agree that because the exceptional and extremely unusual hardship standard is more demanding than the old extreme hardship standard, fewer aliens will be able to meet the standard and thereby qualify for cancellation. I do not believe, however, that Congress intended to make the standard so demanding that it becomes a bar to all but the rarest of cases.

In this regard, Congress accomplished its goal of narrowing the class of aliens eligible for nonpermanent resident cancellation of removal in a number of ways, before the hardship standard is even assessed. An applicant for cancellation of removal must have 10 years of physical presence in the

United States, as opposed to only 7 years under the suspension statute. Section 240A(b)(1) of the Act. He or she must satisfy the physical presence requirement prior to the issuance of a Notice to Appear. Section 240A(d) of the Act. There is an overall cap of 4000 cancellation grants per year. Section 240A(e) of the Act. Further, as already noted, only hardship to qualifying family members of the cancellation applicant can be considered. In all these ways, the number of aliens for whom cancellation of removal can be granted has already been greatly narrowed. We do not need, in addition, a strict and narrow reading of the exceptional and extremely unusual hardship standard to further Congress' goal of reducing the number of aliens eligible for relief.[3] In fact, adopting an overly strict reading of the statute carries the danger of rendering cancellation of removal meaningless for all but a very small number of aliens. I do not believe that is what Congress intended.

## IV. IMMIGRATION JUDGE'S DECISION

The determination of whether an alien has satisfied the exceptional and extremely unusual hardship requirement is inherently fact specific and requires substantial and careful weighing of all the hardship factors presented. For this reason, an Immigration Judge's factual findings are particularly important in a cancellation of removal case, especially a close case like this one. Here, unlike in *Matter of Monreal*, *supra*, the Immigration Judge found that the respondent had shown the requisite level of hardship. Indeed, the Immigration Judge made this finding even after first concluding that the hardship to the respondent's children had to be "unconscionable" to meet the exceptional and extremely unusual hardship standard. In *Matter of Monreal*, *supra*, we specifically rejected an unconscionable standard as too high. Now, the majority rejects the Immigration Judge's finding that the hardship the

---

[3] In my view, nonpermanent resident cancellation of removal cases are different from many other cases coming before the Immigration Judges and the Board. This applicant, like many cancellation applicants, entered the United States illegally. While I do not condone this and believe in the strong enforcement of our laws against illegal entry, I also believe that this respondent's case, and those of persons like her, should be considered in a different light from the cases of criminal or other undesirable aliens. This respondent and her family exhibit many of the values that we, as a society, purport to value. They are hardworking, law-abiding people with strong family values. They pay taxes, are active in their schools and churches, own their own homes, and do not depend on public assistance. We have always required extraordinary equities from criminal aliens before allowing them to stay. Within the confines of the cancellation of removal statute that we are bound to apply, we should not require the same when confronted with individuals such as this respondent. *See generally* Eric Schmitt, *U.S.-Mexico Talks Produce Agreement on Immigration Policy*, *N.Y. Times*, Aug. 10, 2001, at A4 (quoting United States Secretary of State Colin L. Powell as stating that Mexicans living in the United States illegally but who have jobs, pay taxes, and are raising United States citizen children would be included in policy initiatives designed to promote legal residency in this country).

respondent's children would face if removed to Mexico would meet that high standard and concludes that the hardship would not even meet the somewhat lower standard we set forth in *Matter of Monreal*.

As the fact finder in this case, the Immigration Judge was meticulous in reviewing the record and in attempting to assess the hardship issue. The Immigration Judge recounted the respondent's testimony about the hardship that her oldest child, 11-year-old Tanya, would face in Mexico. For example, in the United States, Tanya's school classes are conducted in English, and she is performing very well in school. In Mexico, Tanya would suffer academically since she has limited knowledge of "academic" Spanish; she would be unable to keep up with her peers and would probably be forced to enroll at a lower grade level, in addition to being placed in an educational system that is substandard when compared to that in the United States. The Immigration Judge supported his findings with documentary evidence in the record pertaining to Mexico's educational system.

The Immigration Judge concluded that the citizen children would suffer exceptional and extremely unusual hardship if they accompany their mother to Mexico. Again, the Immigration Judge supported this decision with documentary evidence highlighting the difficulties that persons in the respondent's position face in Mexico. In considering all of the factors in this case, the Immigration Judge applied a "totality of the circumstances" test to find it appropriate to grant cancellation of removal. That is a reasonable approach. Indeed, each one of the factors considered by the Immigration Judge individually may not be enough to meet the exceptional and extremely unusual hardship standard. Taking those factors together, however, I agree with the Immigration Judge that with this family's particular set of circumstances, the citizen children would suffer exceptional and extremely unusual hardship if the respondent is removed to Mexico.

The Immigration Judge thoughtfully considered this case, and I find inadequate reasons for reversing his decision. The standard set forth in *Matter of Monreal*, *supra*, at 65, is that a cancellation applicant must show hardship to qualifying relatives that is "substantially different from, or beyond, that which would normally be expected from the deportation of an alien with close family members here." For the reasons discussed above, I believe that the respondent has made such a showing, and that the Immigration Judge's grant of cancellation should be upheld and the Service's appeal dismissed.

Accordingly, I respectfully dissent.