

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-1-2008

# Moran-Hernandez v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2323

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Moran-Hernandez v. Atty Gen USA" (2008). *2008 Decisions.* Paper 426.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/426

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 07-2323 & 07-3560
_____

ONILDA EVILI MORAN-HERNANDEZ,

Petitioner,

v.

ATTORNEY GENERAL OF THE UNITED STATES

_____

On a Petition For Review of an Order
of the Board of Immigration Appeals
Agency No. A73-533-277
Immigration Judge: Annie S. Garcy

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
August 13, 2008

_____

Before: BARRY, SMITH and HARDIMAN, Circuit Judges

(Opinion filed:  October 1, 2008)

_____

OPINION

_____

PER CURIAM

Appellant Onilda Evili Moran-Hernandez, a native and citizen of Guatemala, filed

a Form I-589 application for asylum and withholding of removal on or about December

23, 1994. It was referred to an Immigration Judge, and, on July 26, 2004, about 10 years later, Moran-Hernandez was served with a Notice to Appear ("NTA") for removal proceedings. It was alleged that she was removable under Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien who entered without inspection. During the decade that her asylum application was pending, Moran-Hernandez gave birth to a daughter, Isabel Orellana, and a son, Angel Orellana, Jr., and, although she did not marry, she and the children lived with their father, Angel Orellana, Sr., as a family in central New Jersey. Following being served with the NTA, Moran-Hernandez obtained counsel, withdrew her asylum application, and applied for cancellation of removal under INA § 240A(b)(1), 8 U.S.C. § 1229b(b)(1), for certain non-permanent residents, contending that her removal would present an exceptional and extremely unusual hardship to her two United States citizen children who would suffer economic and educational harm in Guatemala.

At her removal hearing, Moran-Hernandez testified that she worked cleaning houses in Princeton, New Jersey, earning about $9,000 annually.[1] The children's father had a landscaping business and supported his family. He bought a home valued at $125,000 where the family lived, and together the couple made regular payments on the $100,000 mortgage. Isabel, age 6, attended Saint Paul School in Princeton, which cost the couple $3,700 each year in tuition. She also takes ballet lessons and has attended

---

[1] The administrative record contains character references attesting to Moran-Hernandez' honesty and dependability.

modeling school in Philadelphia. Angel, Jr., age four, attended preschool in Princeton. Moran-Hernandez testified it was her hope that her children, unlike her, would be able to study beyond the sixth grade. Public education in rural areas ends for Guatemalan children at the sixth grade, and uneducated men and women in Guatemala are condemned to extreme poverty. If removed to Guatemala, she would have to live in her deceased mother's two-room adobe house in the village of Jalapa. The house has no running water and no bathroom. Additionally, the house was badly damaged by a tropical storm that devastated the region.

The children's father, Angel Orellana, Sr., also a Guatemalan citizen, was removed from the United States by the Department of Homeland Security six months or so prior to Moran-Hernandez' removal hearing. Moran-Hernandez testified that, following his removal, she assumed operation of the landscaping business, which employed two persons, and had, as assets, lawnmowers, leaf blowers, and a truck. She testified that the business brought in approximately $1,800 each month. If she is removed to Guatemala, she would return to selling food, earning about $40-50 weekly. Her father lives in nearby San Juan. She did not think she would be welcomed there because he recently remarried. The children's father has returned to agricultural work in San Juan, but his tomato crop was destroyed by the tropical storm. Moran-Hernandez submitted recent reports on human rights abuses in Guatemala, and squalid and unsanitary conditions following the tropical storm.

The Immigration Judge granted Moran-Hernandez' application for cancellation of removal on December 12, 2005, and adjusted her status to that of a lawful permanent resident. The IJ concluded that Moran-Hernandez met the physical presence, good moral character, and no specified crimes requirements. As to the "exceptional and extremely unusual hardship" standard, the IJ considered Matter of Monreal, 23 I. & N. Dec. 56 (BIA 2001) (denying relief to father of three where his undocumented wife had returned to Mexico with their infant prior to his removal hearing), but reasoned that Moran-Hernandez' case was closer to In re: Gonzalez-Recinas, 23 I. & N. Dec. 467 (BIA 2002) (en banc), where the Board of Immigration Appeals held that cancellation of removal was warranted because the single mother of six children (four of whom were qualifying relatives), was the sole means of economic support for her children, and she had no comparable means of providing for them in Mexico, no close family members in Mexico, her ex-husband did not help to support the children, and the children did not speak Spanish and had never traveled to Mexico. The IJ concluded that, like the single mother in Recinas, Moran-Hernandez would be on her own with little or no ability to feed and house her children. The children's father and Moran-Hernandez' father were unlikely to provide any financial support to the children in Guatemala, and Guatemala had recently been severely damaged by the tropical storm, which had caused unsanitary conditions and damage to housing and crops. Moran-Hernandez' children thus would be forced to endure, not just a lower standard of living, but life in hopeless circumstances in an

4

impoverished and devastated place.

The Department of Homeland Security ("DHS") appealed, emphasizing other factual findings made by the IJ, including that Moran-Hernandez and Angel Orellana, Sr., had accumulated assets in the United States that, once sold, would ease her transition to the more impoverished nation. In addition, Mr. Orellana, since his removal in 2005, had begun work in Guatemala as a farmer. He would be there to provide financial and emotional support, notwithstanding recent bad weather. The children speak some Spanish and are in good health. In short, the record established only that Moran-Hernandez would make a better living in New Jersey than she would in Guatemala, and thus the high standard established by Congress when IRRIRA was enacted was not satisfied.

In a decision dated April 4, 2007, the Board sustained the appeal, vacated the IJ's decision, and denied the application for cancellation of removal. The Board did not agree that its decision in Recinas, 23 I. & N. Dec. 467, applied, reasoning instead that Moran-Hernandez' circumstances were more like the alien's in In re: Andazola-Rivas, 23 I. & N. Dec. 319, 324 (BIA 2002) (en banc) (denying relief to unmarried mother of two). Like the alien in Andazola, Moran-Hernandez had accumulated assets in the United States that would help her in establishing a new life in Guatemala. The children's father lived in Guatemala and there were other family members there to provide emotional support. The Board further noted that, even though her family had been negatively impacted by a

5

natural disaster, Moran-Hernandez had not shown that she could not find work in Guatemala or that she could not relocate to an area that was not damaged. She had experience selling food, and had acquired skills as a house cleaner and owner of a landscaping business. The Board granted Moran-Hernandez voluntary departure.

Moran-Hernandez filed a timely motion for reconsideration pursuant to 8 C.F.R. § 1003.2(b), contending that the Board did not consider the totality of the record. She also filed a timely petition for review of the Board's April 2007 decision in this Court (No. 07-2323). In a decision dated July 26, 2007, the Board denied the motion, concluding that it raised no new issues or facts, and stating that it had indeed considered the entire record in issuing its original decision. Moran-Hernandez timely filed a petition for review of this decision (No. 07-3560). Our Clerk has consolidated the petitions for review.

We will grant the petitions for review, reverse the Board's April 4, 2007 and July 26, 2007 decisions, and reinstate the IJ's December 12, 2005 decision granting Moran-Hernandez cancellation of removal under INA § 240A(b)(1) and adjusting her status to that of Lawful Permanent Resident of the United States. We have jurisdiction generally to review final orders of removal pursuant to 8 U.S.C. § 1252(a)(1). Section 1252(a)(2)(B)(i) of the jurisdictional statute removes our jurisdiction over the Board's discretionary decisions regarding cancellation of removal under 8 U.S.C. § 1229b. See Mendez-Moranchel v. Ashcroft, 338 F.3d 176, 179 (3d Cir. 2003). To succeed on an application for cancellation of removal an alien must establish, among other things, that

6

removal would result in "exceptional and extremely unusual hardship" to a qualifying relative. We held in Mendez-Moranchel that this determination is a "quintessential discretionary judgment." Id. Thus, if the Board denied Moran-Hernandez' application for cancellation of removal based solely on a discretionary determination that she failed to establish that her removal would result in "exceptional and extremely unusual hardship" to her U.S. citizen children, see 8 U.S.C. § 1229b(b)(1)(D), we would lack jurisdiction, and the absence of jurisdiction would extend to Moran-Hernandez' motion for reconsideration as well because the issue presented by it is essentially the same discretionary hardship issue originally decided, see Fernandez v. Gonzales, 439 F.3d 592, 600 (9th Cir. 2006); Martinez-Maldonado v. Gonzales, 437 F.3d 679, 683 (7th Cir. 2006).

Moran-Hernandez contends, however, that she was deprived of due process, thus bringing her case within 8 U.S.C. § 1252(a)(2)(D), which restores our jurisdiction to consider constitutional claims and questions of law. In her effort to avoid the jurisdictional bar of 8 U.S.C. § 1252(a)(2)(B)(i), she argues persuasively that the Board failed to review the entire record before making its determination that she was not eligible for cancellation of removal, and failed to consider the factors it set forth in its precedent, Recinas, 23 I. & N. Dec. 467. We conclude that we have jurisdiction over what is fundamentally an argument concerning the application of the law to uncontested facts. See Kamara v. U.S. Attorney General, 420 F.3d 202, 211 (3d Cir. 2005) (under the Real ID Act of 2005, jurisdiction extends to constitutional issues, pure questions of law, and

issues of application of law to uncontested facts).  See also Cabrera-Alvarez v. Gonzales, 423 F.3d 1006, 1009 (9th Cir. 2005) (finding jurisdiction under 8 U.S.C. § 1252(a)(2)(D) over question whether Board's interpretation of hardship standard violated due process).  Cf. Sukwanputra v. Gonzales, 434 F.3d 627, 634 (3d Cir. 2006) (factual and discretionary determinations continue to fall outside our jurisdiction but 8 U.S.C. § 1252(a)(2)(D) would extend to question whether Board applied wrong legal standard in making discretionary determination).[2]

We turn then to the merits of the only cancellation of removal issue presented by the petitions for review – whether Moran-Hernandez has shown that her two U.S. citizen minor children will suffer exceptional and extremely unusual hardship if she is removed to Guatemala.  Congress created the relief of cancellation of removal under INA § 240A(b)(1) as part of the Illegal Immigration Reform and Immigrant Responsibility Act.  It is available to an alien who has been physically present in the United States for at least 10 years, has been a person of good moral character, has not been convicted of a specified criminal offense, and has established that removal would result in exceptional and

---

[2] Moran-Hernandez also contends that she was encouraged to withdraw her asylum application without a precise understanding that the Department of Homeland Security could appeal the IJ's decision awarding her cancellation of removal, and actually prevail. This argument presents neither a constitutional claim nor question of law.  Moran-Hernandez was represented by counsel when she withdrew the asylum application, and she withdrew it well before she had any indication that the IJ would grant her cancellation of removal.  We discern no violation of her right to due process in these circumstances. We also find unpersuasive Moran-Hernandez' contention that she was confused by the questions put to her during the removal hearing.

extremely unusual hardship to the alien's spouse, parent, or child, who is a United States citizen or lawful permanent resident. 8 U.S.C. § 1229b(b)(1)(A)-(D). Moran-Hernandez satisfied the first three requirements, and they are not at issue.

Prior to IIRIRA, an alien could apply for suspension of deportation, where it was only necessary to show "extreme hardship." IRRIRA's standard of "exceptional and extremely unusual hardship" is less generous than the former standard. See Andazola, 23 I. & N. Dec. at 322; Recinas, 23 I. & N. Dec. at 470. In Monreal, 23 I. & N. Dec. 56, the Board found that, to establish "exceptional and extremely unusual hardship," an alien must show that the qualifying relative would suffer hardship substantially beyond that which would normally result from deportation. Id. at 60. See also Andazola, 23 I. & N. Dec. at 322. Monreal and Andazola – which the Board cited here along with Recinas – remain the "seminal interpretations of the meaning of 'exceptional and extremely unusual hardship.'" Recinas, 23 I. & N. Dec. at 472-73. Recinas, 23 I. & N. Dec. 467, did not articulate a different standard for evaluating "exceptional and extremely unusual hardship" than Monreal, 23 I. & N. Dec. 56, and Andazola, 23 I. & N. Dec. 319, but the Board certainly did reaffirm in Recinas, an en banc decision, that the "exceptional and extremely unusual" requirement is "not so restrictive that only a handful of applicants, such as those who have a qualifying relative with a serious medical condition, will qualify for relief." Id., 23 I. & N. Dec. at 470.

We hold that the Board misapplied its precedent to uncontested facts by failing to

9

take into account Moran-Hernandez' evidence that Guatemala had recently been devastated by a tropical storm and thus offered her no immediate way to feed and house her two minor qualifying children. Just as Hurricanes Katrina, Rita and Wilma devastated parts of the United States during the notorious 2005 Atlantic hurricane season, Hurricane, and then Tropical Storm, Stan devastated Guatemala in early October 2005. Uncontested evidence was presented at Moran-Hernandez' removal hearing that Tropical Storm Stan caused widespread flooding and mudslides that devastated more than half of Guatemala. It was considered one of the deadliest of the 2005 season.[3] Moran-Hernandez' evidence established that more than half of Guatemala – the Pacific Coast, southwest and central areas of Guatemala, including Jalapa -- was affected. Shelter, sanitary conditions, and the nation's food supply were affected. A.R. 366-69. Notwithstanding this indisputable evidence of the severe harm caused by a very recent natural disaster in the country designated for removal, the Board ignored its own requirement, see Monreal, 23 I. & N. Dec. at 63; Recinas, 23 I. & N. Dec. at 471, to give due consideration to how a *severely* lower standard of living caused by an extremely unusual event might affect the qualifying relatives.

The record evidence shows that Moran-Hernandez and the children's father would

---

[3] Like the names "Katrina" and "Rita," the name "Stan" has been retired from the list of potential hurricane names by an international committee of the World Meteorological Organization in recognition of the deadly and costly nature of the storm, according to the National Weather Service National Hurricane Center's website, http://www.nhc.noaa.gov/retirednames.shtml.

have no choice but to try and make a living in Guatemala through food preparation and agriculture, respectively. There is no evidence whatever that the couple would be able to run a landscaping business in devastated Guatemala, or that Moran-Hernandez would be able to clean houses as she did in Princeton, New Jersey. Her extended family lost their income for the immediate future due to the October 2005 storm. Although the record establishes that the children's father will likely be there for them emotionally, there were no resources for him to care for and maintain the children because he suffered a loss of his crops in the storm. The father in Andazola, 23 I. & N. Dec. 319, in contrast, had authorization to remain in the United States and his ability to continue working and supporting his children was unaffected. Furthermore, Moran-Hernandez would be relegated to living in the two-room adobe hut where she was raised, which was "wet" at the time of her hearing from the tropical storm. At the time of her removal hearing, the children's father was living in a nylon tent because his adobe hut was uninhabitable.

In short, this is not simply an unexceptional case of qualifying relatives having to adjust to a lower standard of living. In Monreal, the Board held that it must be demonstrated that the qualifying relative would suffer hardship that is substantially beyond that which would ordinarily be expected to result from the alien's deportation. That showing was made here with evidence of the devastating effects of Tropical Storm Stan. Monreal holds that it need not be shown that such hardship would be "unconscionable," 23 I. & N. Dec. at 60, but, in effect, that is the showing the Board

11

required of Moran-Hernandez.  Taking all of the evidence into consideration, with due regard for its significance, and applying all of the factors identified in <u>Monreal</u> and <u>Andazola</u>, as required by due process, this case amply demonstrates a truly exceptional situation, <u>Monreal</u>, 23 I. & N. Dec. at 62, in which removal of an alien would work an "extremely unusual" hardship on two qualifying United States citizens.

For the foregoing reasons, we will grant the petitions for review, reverse the Board's April 4, 2007 and July 26, 2007 decisions, and reinstate the IJ's December 12, 2005 decision granting Moran-Hernandez cancellation of removal under INA § 240A(b)(1) and adjusting her status to that of lawful permanent resident.